FOOTWEAR DISTRIBUTORS AND RE-
TAILERS OF AMERICA, f/k/a Foot-
wear Retailers of America, et al., Plain-
tiffs,

v.

The UNITED STATES, Defendant,

and

Footwear Industries of America,
Inc., Intervenor–Defendant.

Court No. 85–04–00581.
Slip Op. No. 94–77.

United States Court of
International Trade.

May 10, 1994.

Mudge Rose Guthrie Alexander & Ferdon, Washington, DC (Michael P. Daniels, N. David Palmeter and Gregory J. Spak), for plaintiff Footwear Distributors and Retailers of America.

Howrey & Simon, Washington, DC (Herbert C. Shelley and Joel D. Kaufman), for plaintiff Special Commodity Group of Non–Rubber Footwear from Brazil, American Ass'n of Exporters and Importers.

Frank W. Hunger, Asst. Atty. Gen.; David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice (Velta A. Melnbrencis); and Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, DC (Lisa Koteen and Joan L. MacKenzie), of counsel, for defendant.

Collier, Shannon, Rill & Scott, Washington, DC (Lauren R. Howard), for intervenor-defendant.

## OPINION

AQUILINO, Judge:

Given the decision of an international panel that the United States acted inconsistently with Article I:1 of the General Agreement on Tariffs and Trade and U.S. acquiescence in that decision in favor of Brazil, the parties return to this action to finally dispose of issues arising from the time of creation of this Court of International Trade, which is an extension of the great American experiment in judicial review of prerogatives of the sovereign that began with Chief Justice John Marshall's nascent pronouncements that it is "emphatically the province and duty of the judicial department to say what the law is", *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803), and "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains", *Murray v. Schooner Charming Betsy,* 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804). These principles remain of the essence in this action on the advent of the new World Trade Organization in furtherance of the *Final Act Embodying the Results of the Uruguay Round of Multilateral Trade Negotiations* to which the United States claims commitment.

I

Jurisdiction of the court has been invoked by the plaintiffs pursuant to 19 U.S.C. § 1516a(a)(2) and 28 U.S.C. § 1581(c) for review of *Non–Rubber Footwear From Brazil; Final Results of Administrative Review of Countervailing Duty Order,* 50 Fed.Reg. 15,597 (April 19, 1985), which was conducted by the International Trade Administration,

U.S. Department of Commerce ("ITA"). Among other things, those results

determine the aggregate net subsidy to be 11.03 percent for the period December 7, 1979, through December 31, 1979, and 8.84 percent for the period January 1, 1980, through December 31, 1980. Accordingly, the Department will instruct the Customs Service to assess countervailing duties of 11.03 percent of the f.o.b. invoice price on all shipments of Brazilian non-rubber footwear exported on or after December 7, 1979, and on or before December 31, 1979. The Department will instruct the Customs Service to assess countervailing duties of 8.84 percent of the f.o.b. invoice price on all shipments exported on or after January 1, 1980, and on or before December 31, 1980.

50 Fed.Reg. at 15,599.

After joinder of issue, the plaintiffs interposed motions for judgment on the record compiled by the ITA in rendering this determination. Plaintiff Footwear's proposed order in conjunction therewith, for example, would declare it null and void and decree that the covered merchandise from Brazil entered on or after January 4, 1980 and exported from that country before December 31, 1980 be liquidated with no assessment of countervailing duties and refund of any such duties previously deposited.

## A

While those motions were pending, plaintiff Footwear notified this court that the Committee on Subsidies and Countervailing Measures organized under the General Agreement on Tariffs and Trade ("GATT") had agreed to a request by Brazil to convene a three-member panel to consider whether imposition of countervailing duties as determined above violated the obligations of the United States under its Agreement on Interpretation and Application of Articles VI, XVI and XXIII of GATT, the so-called "Subsidies Code", *done* April 12, 1979, 31 U.S.T. 513, T.I.A.S. No. 9619, and also that the U.S. government had consented to such a panel. The plaintiff[1] moved for a stay of proceed-

ings, arguing, among other things, that an interpretation of that code by the panel would either resolve, or contribute to resolution of, the issues herein. The stay was granted, but plaintiff's prediction did not prove true.

GATT article VI:6(a) provides that no contracting party shall levy any antidumping or countervailing duty on a product from another contracting party unless the former determines that the effect of the dumping or subsidization causes or threatens to cause material injury to an established domestic industry, or retards materially the establishment of a domestic industry. Article 1 of the Subsidies Code governs application in general of this provision, while article 4 addresses actual imposition of countervailing duties, *e.g.*:

3. When a countervailing duty is imposed in respect of any product, such countervailing duty shall be levied, in the appropriate amounts, on a non-discriminatory basis on imports of such product from all sources found to be subsidized and to be causing injury, except as to imports from those sources which have renounced any subsidies in question or from which undertakings under the terms of this Agreement have been accepted.

\*   \*   \*   \*   \*   \*

9. A countervailing duty shall remain in force only as long as, and to the extent necessary to counteract the subsidization which is causing injury. The investigating authorities shall review the need for continued imposition of the duty, where warranted, on their own initiative or if any interested party so requests and submits positive information substantiating the need for review.

With such provisions presumably in mind, the Brazilian government prayed in its formal Request for Conciliation under Article 17 of the Agreement

that the United States Government honor its obligations under the General Agreement and the Subsidies Code by abandon-

---

**1.** Unless otherwise indicated hereinafter, "plaintiff" references will mean the Footwear Distribu-

tors and Retailers of America only.

ing its efforts to collect any countervailing duties on Brazilian non-rubber footwear entering the United States on or after January 1, 1980 ... [and] recognize that its collection of cash deposits and its attempt to collect countervailing duties in excess of those deposits violate the relevant provisions of the Code.[2]

However, the three individuals from Germany, Hungary and Malaysia empanelled by the Subsidies Committee were unable to conclude that such relief was required. Rather,

the Panel concluded that the collection of countervailing duties by the United States on entries of non-rubber footwear from Brazil between 4 January 1980 and 28 October 1981 was consistent with the United States' obligations under the Code.[3]

It delved into the history of the disagreement which is appropriate to recite at length now, to wit:

2.1 On 12 September 1974 the US Department of the Treasury issued a countervailing duty order (T.D. 74–233, 39 FR 32903) regarding non-rubber footwear from Brazil. Pursuant to this order countervailing duties were imposed, as of that date, under Section 303 of the Tariff Act of 1930 which had been covered by the existing legislation clause under the GATT Protocol of Provisional Application, and therefore no injury determination was made. In accordance with the US law and practice then in effect, suspension of liquidation was not ordered and duties in the amounts determined in the countervailing duty order were collected upon entry.

2.2 On 28 December 1979 the US ... Treasury issued a notice (T.D. 80–12) announcing the suspension of liquidation of all entries of footwear exported from Brazil on or after 7 December 1979 and entered or withdrawn from warehouse, for consumption, on or after 4 January 1980.... (45 FR 1013).... This suspension was to remain in force pending receipt of updated information on subsidies remaining after the Industrial Products Tax (IPI) programme had been eliminated.

Until such time a deposit of the estimated countervailing duty, the net amount of which had been calculated to be 1.0 per cent, would be required.... The notice specified the reasons for choosing the date of 7 December 1979: "... the Government of Brazil announced that the export payments, which were in the form of IPI credits, would be eliminated immediately instead of over a 4–year period.... Accordingly, this notice adjusts the countervailing duty rates on the subject merchandise to take into account the immediate elimination of the IPI credits."

2.3 On 1 January 1980 the Code entered into force. Brazil and the United States were among the original signatories ... and neither of them had entered any reservation in terms of Article 19:3. On the same date the provisions of Title I of the US Trade Agreements Act of 1979 (TAA) became effective. On 2 January 1980, the authority for administering the countervailing duty law was transferred from the US ... Treasury to the US Department of Commerce (DOC). Section 104(b) of the TAA provided that signatories might request, within a three year period starting 1 January 1980, an injury review for pre-existing countervailing duty orders. According to Section 104(b)(3), whenever the US International Trade Commission (USITC) received such a request, it should promptly notify the DOC, and the DOC should suspend liquidation of entries of the affected merchandise made on or after the date of the receipt of the USITC's notification. According to Section 104(b)(4) if the USITC determined that an industry in the United States would not be materially injured if the countervailing duty order were to be revoked, the DOC should revoke this order and refund "... any estimated countervailing duties collected during the period of suspension of liquidation."

2.4 On 28 October 1981 the USITC notified the DOC that ... Brazil had requested ... an injury determination for the 1974 countervailing duty order under Sec-

---

2. GATT Doc. SCM/87, p. 6 (21 June 1988).

3. Report by the Panel, *United States–Countervailing Duties on Non–Rubber Footwear From Brazil*, GATT Doc. SCM/94, para. 4.14 (4 Oct. 1989).

tion 104(b).... No suspension of liquidation was ordered at that time and the original suspension of liquidation ordered on 4 January 1980 remained in effect. As subsequently explained in the notice of revocation (48 FR 28310, 21 June 1983) "it was not necessary for the Department, upon notification by the USITC, to suspend liquidation of entries of the merchandise pursuant to that section (section 104(b) [ ] of the TAA), since previous suspensions remained in effect."

2.5 Effective 26 July 1982 the Government of Brazil subjected exports of non-rubber footwear to the United States to an offsetting export tax of 8.0 per cent of the f.o.b. invoice price; this was in addition to an export tax imposed on 4 May 1981. By letter of 22 April 1983, the Brazilian Minister of Finance confirmed to the US Secretary of Commerce that the tax was of indefinite duration and would not be affected by revocation of the countervailing duty order.

2.6 On 24 May 1983 the USITC determined that an industry in the United States would not be materially injured, or threatened with material injury, by reason of imports of Brazilian non-rubber footwear if the countervailing duty order were revoked (48 FR 24796, 2 June 1983). As a result, the DOC revoked, by decision ... published on 21 June 1983 (48 FR 28310), this countervailing duty order with respect to all merchandise entered, or withdrawn from warehouse for consumption, on or after 29 October 1981, the date [after] the DOC had received notification of the request for an injury determination. The DOC also instructed customs officers to refund any estimated countervailing duties collected with respect to these entries. The USITC's decision and the DOC revocation did not affect shipments of the merchandise entered on or before 28 October 1981.

2.7 On 19 April 1985 the DOC published the final results of its administrative review of the countervailing duty order on non-rubber footwear from Brazil concern-

ing goods exported between 7 December 1979 and 31 December 1980. The countervailing duty levied on the entries between 1 January 1980 and 31 December 1980 was 8.84 per cent. On 9 January 1987 the DOC published the final results of its administrative review of this order concerning goods exported between 1 January 1981 and 28 October 1981 and accordingly levied a duty of 6.04 per cent.[4]

With these findings of fact, the panel reached a conclusion contrary to the position of Brazil upon the following reason, among others:

... [T]he approach taken in this case was consistent with US obligations under the Code as derived from Article VI:6(a) of the General Agreement because Brazil's request could have been made on 1 January 1980 and, in the case of a negative injury determination, the countervailing duty order could have been revoked as of the date of the request. Brazil chose not to invoke its rights on 1 January 1980 but submitted its request at a later date. The Panel recalled its views ... that if the signatory subject to the pre-existing countervailing duty decision were to choose not to invoke its right as of 1 January 1980 but made its request at a later date, there was nothing in Article VI or in its subsequent interpretation in the Code to imply that any earlier date than the date of the request would be relevant for an injury determination and possible revocation of countervailing duties.[5]

After this report had been circulated within GATT, counsel for the defendant moved this court to vacate plaintiff's stay on the ground that Brazil had

asked the Committee to postpone its consideration of the report until the next semi-annual meeting. Because the GATT acts by consensus, any country's delegation, dissatisfied with a panel report, can block the adoption of the panel report by merely raising an objection to the adoption of the report or requesting further consideration, a procedure that is not uncommon when a panel decision is unfavorable to a particular country. Unless and until the

---

**4.** *Id.* at pp. 2–3 (footnote omitted).

**5.** *Id.* at 24.

Committee adopts a panel report, the panel report does not become public and any Committee action on the report is effectively prevented.

Because the panel has issued its findings, there is no reason to continue the stay of proceedings in this case pending formal Committee action.[6]

In opposition, the plaintiff reported that Brazil had "raised substantive objections to the panel report which were serious enough to cause four governments *other* than Brazil to express their concern and reservations that the report is flawed or to ask for additional time to consider the report before the Committee makes a final decision."[7] The plaintiff also reported that Brazil had "followed up its objections by initiating action under Article XXIII of the GATT contending that the actions by the United States have nullified and impaired benefits owed to Brazil by the United States."[8]

Although the foregoing panel report apparently has never been formally adopted, the motion to dissolve the stay was not granted.

## B

That is, this action remained in abeyance while its proponent(s) pursued the article XXIII avenue. In particular, another three-member panel convened[9], this one under the aegis of the GATT Council of Representatives, to consider "an alleged denial by the United States of most-favoured-nation treatment under Article I in the implementation of its Article VI obligations with respect to a countervailing duty order on non-rubber footwear from Brazil".[10] After reviewing and considering the factual aspects, the scope of its proceeding, and the arguments of the parties and also of India as to application of different countervailing-duty laws, like products, evolution of those law(s) in the United States, dutiable versus duty-free products,

and the timing of Brazil's request for an injury review, the panel found that

the United States failed to grant, pursuant to Section 104(b) of the Trade Agreements Act of 1979, to products originating in contracting parties signatories to the Subsidies Agreement the advantage accorded in Section 331 of the Trade Act of 1974 to like products originating in countries beneficiaries of the United States GSP programme, that advantage being the automatic backdating of the revocation of countervailing duty orders issued without an injury determination to the date on which the United States assumed the obligation to provide an injury determination under Article VI:6(a). Accordingly, the Panel concludes that the United States acted inconsistently with Article I:1 of the General Agreement.

GATT Doc. DS18/R, para. 7.2. In reaching this conclusion, the panel noted that Brazil had requested a general ruling and not that the panel make a specific recommendation to the Council. *See id.*, para. 7.1.

According to the report of the panel, Brazil had indicated at the outset that it "did not intend to relitigate the issues considered by the Subsidies Agreement panel." *Id.*, para. 2.3. Moreover, "it did not consider that any one of the three different countervailing duty laws of the United States implementing United States obligations under Article VI, standing alone, violated Article I:1." *Id.*, para. 4.3. Instead, Brazil had contended that the United States had

failed to implement the injury determination requirement of Article VI in a consistent manner. In the application of its Article VI obligations, the United States treated imports from Brazil less favourably than imports from other contracting parties—specifically, fasteners from India, steel wire rod from Trinidad and Tobago, and industrial lime and automotive glass from Mexico—and consequently, the Unit-

---

**6.** Defendant's Motion for Dissolution of Stay Ordered by This Court on December 9, 1988, p. 2.

**7.** Plaintiff's Opposition to Defendant's Motion for Dissolution of Stay, p. 2 (emphasis in original).

**8.** *Id.*

**9.** This group was drawn from Australia, Hong Kong and Switzerland.

**10.** Report of the Panel, *United States–Denial of Most–Favoured Nation Treatment as to Non–Rubber Footwear From Brazil*, GATT Doc. DS18/R, para. 1.1 (13 Dec. 1991).

ed States denied Brazil the unconditional benefits guaranteed under Article I:1. In the case involving non-rubber footwear from Brazil, the United States had backdated the effect of its negative injury determination to the date of Brazil's request for an injury review, whereas in the cases involving India, Trinidad and Tobago, and Mexico, the United States had backdated the effect of its negative injury determinations to the date on which the United States obligations under Article VI entered into force, regardless of the date on which or by whom injury reviews had been requested.

*Id.,* para. 4.4.

The United States had argued in response that "the central requirement of Article I was that most-favoured-nation treatment be accorded to 'like products'." *Id.,* para. 4.9. It had pointed out that

Brazil had omitted to mention that the United States had conducted injury review investigations of outstanding countervailing duty orders on non-rubber footwear from India and Spain at the same time as, and applying identical procedures to those used in[,] the Brazil review.

*Id.,* para. 4.15.

... [N]ot only non-rubber footwear but all dutiable products from Subsidies Agreement signatories with outstanding countervailing duty orders were treated in an identical fashion under the transitional procedure of Section 104(b) of the Trade Agreements Act of 1979.

*Id.,* para. 4.16. Whereupon Brazil countered that its footwear

and footwear from India and Spain were treated the same not because they were footwear. They were treated the same because, for reasons of United States domestic law, they were processed under the same countervailing duty law of the United States—Section 104 of the 1979 Act, applicable to injury reviews of pre-existing countervailing duty orders concerning dutiable products from Subsidies Agreement signatories.

*Id.,* para. 4.26. Further:

... [T]he fact that footwear from India and Spain may have been discriminated

against as well as footwear from Brazil did not change the fact that Brazil experienced discrimination.

*Id.,* para. 4.27. Also, Brazil considered that the

real distinction to be made was not that between footwear and everything else, but between dutiable and duty-free products. Perhaps this distinction would be valid in situations in which dutiable and duty-free were permanent, fixed categories. But that was not the case here. Products moved from dutiable to duty-free status, and from duty-free to dutiable status, within the United States for a wide variety of reasons.

*Id.,* para. 4.28.

After considering these and the other arguments, the panel determined that "the automatic backdating of the effect of revocation of a pre-existing countervailing duty order, without the necessity of the country subject to the order making a request for an injury review, is properly considered to be an advantage within the meaning of Article I:1." *Id.,* para. 6.9. The panel also noted that, even though the United States levied countervailing duties on nonrubber footwear from Brazil, India and Spain without discriminating on the basis of the country of origin,

the CONTRACTING PARTIES had decided in previous cases that legislation mandatorily requiring the executive authority to impose a measure inconsistent with the General Agreement was inconsistent with that Agreement as such, whether or not an occasion for the actual application of the legislation had arisen.

*Id.,* para. 6.13, citing *United States—Taxes on Petroleum and Certain Imported Substances,* adopted 17 June 1987, GATT BISD 34S/136, 160; *European Economic Community–Regulation on Imports of Parts and Components,* adopted 16 May 1990, GATT BISD 37S/132, 198.

The minutes of a meeting of the GATT Council on June 19, 1992 state that Brazil reiterated its request that the United States agree to adoption of the panel report and also that the U.S. representative

said that although the United States considered the Panel's analysis and conclusions to be seriously flawed, it would agree to adoption of the report out of respect for the dispute settlement process. The United States noted, however, that Brazil had repeatedly blocked adoption of a panel report on the same issue (SCM/94) in the Subsidies Code Committee, which had concluded that the United States had acted consistently with the Code in declining to revoke a countervailing duty order on non-rubber footwear imports from Brazil as of the date of Brazil's accession to the Code. While the United States would be justified in refusing to allow adoption of the Panel report at hand (DS18/R) until Brazil had allowed adoption of the report under the Code, it would not do so. However, it fully expected, and would insist, that Brazil follow its example and allow the report under the Code to be adopted.

The United States also wished to emphasize its disagreement with two aspects of the report. First, the Panel had ignored the fact that the Proposal of Provisional Application (PPA) relieved the United States from the obligation to provide any injury test for dutiable merchandise, including footwear, subject to countervailing duty orders. Second, the Panel had erroneously concluded that the United States had violated Article I. The m.f.n. clause expressly applied to "like products", and the United States had accorded identical treatment to imports of non-rubber footwear—the "like product"—from all countries. For these reasons, it believed that the Panel had erred in concluding that the United States had acted inconsistently with the General Agreement. Nevertheless, the United States agreed to the adoption of this report, which had expressly provided only a general ruling and had not made any specific recommendation.

GATT Doc. C/M/257, p. 8 (10 July 1992) (footnotes omitted). Those minutes also reflect a related plea by Brazil that the United States

take the necessary steps to bring itself into compliance with the Panel's conclusion. Brazil therefore expected that the mental reservations expressed by the United States would not be to the detriment of implementation. As Brazil had repeatedly stated, this dispute was no academic matter, and had been brought to the Council as a result of its significant impact on Brazil's export interests. In Brazil's understanding, adoption of a panel report implied compliance with it, and it reiterated its expectation that the United States would take the necessary steps to implement the Panel's conclusion and bring itself into GATT compliance.

*Id.* at 8–9.

C

With the proceedings in Geneva at an end, the parties have returned here for final disposition of this action. In its concomitant order dissolving the stay, the court afforded the parties an opportunity to supplement their original papers in support of and opposition to the motions of the plaintiffs for judgment on the agency record or summary judgment. Plaintiff Special Commodity Group of Non–Rubber Footwear from Brazil rests on those papers, whereas plaintiff Footwear has filed additional briefing, arguing, among other points, (1) that the ITA violated section 104(b) of the Trade Agreements Act of 1979, 19 U.S.C.A. § 1671 note (1980), in assessing countervailing duties on 1980 entries of Brazilian non-rubber footwear; (2) that, if that section permitted the agency to collect countervailing duties on those entries, the ITA acted illegally in attempting to collect such duties in excess of the one-percent deposit posted thereon; and (3) that, if collection of such excess duties was lawful, the matter should be remanded to the agency for redetermination of the net subsidy and for foreclosure of assessment of compound interest for the period prior to November 1984.[11]

On its part, the defendant lists some seven issues for the court's consideration, namely, (1) whether the ITA's determination to as-

11. *See generally* Plaintiff's Supplemental Memorandum in Support of Motion for Judgment Upon the Agency Record, pp. 4–6.

sess countervailing duties on non-rubber footwear from Brazil entered prior to October 29, 1981 and not to refund the estimated duties deposited before then is subject to judicial review in the absence of a timely challenge thereof; (2) whether, to the extent there is such jurisdiction, the agency properly interpreted 19 U.S.C. § 1675 and section 104(b) of the Trade Agreements Act of 1979 as requiring the assessment of countervailing duties for the period preceding receipt of Brazil's request for an injury determination; (3) whether any international obligations of the United States preclude the ITA from assessing countervailing duties for the period in question; (4) whether the court has jurisdiction to decide if the merchandise should be deemed liquidated by operation of 19 U.S.C. § 1504(a) at the estimated countervailing-duty rates because of an alleged failure of the U.S. Customs Service to give notice of suspension of liquidation to the individual importers; (5) whether the defendant is barred by the doctrine of laches from collecting countervailing duties based upon the agency determination underlying this action; (6) whether the ITA was precluded from changing its methodology for calculation of the appropriate benchmark rate for Brazilian export financing programs; and (7) whether the question of the rate of interest

which is payable upon underpayment of estimated countervailing duties is properly before the court at this time.[12]

Initially, after intervention as a party defendant, Footwear Industries of America, Inc. ("FIA") submitted a memorandum in opposition to the motions by the plaintiffs. However, that trade association's counsel report that "circumstances in the industry have changed dramatically"[13] since then, that it has "urged the U.S. government ... to settle the pending litigation by retaining the estimated duties already deposited and waiving the collection of any additional duties as well as the interest on the subject entries"[14] and that "it no longer supports the position of the United States to the extent it is inconsistent with the settlement proposal proffered to the government."[15]

In the absence of compromise among the parties, this court remains obligated to adjudicate the foregoing issues. *Cf. Gilmore Steel Corp. v. United States*, 11 CIT 684, 691, 672 F.Supp. 1459, 1464 (1987) ("§ 1675 contains no reference to industry support as a precondition for obtaining review"), *rev'd on another ground*, 862 F.2d 1541 (Fed.Cir. 1988).

---

12. *See* Defendant's Supplemental Memorandum in Opposition to Plaintiffs' Motions for Judgment Upon the Agency Record or for Summary Judgment, pp. 2–3.

13. Letter of Lauren R. Howard, Esq., first page (Nov. 30, 1992).

14. *Id.* at 2.

15. *Id.* The letter also states:

> To compound the injury that the U.S. industry will face if this Court rules in favor of the United States, Brazil has a right to demand compensation under the General Agreement on Tariffs and Trade ... because the GATT Contracting Parties (including the United States) have adopted a panel report ... that the U.S. ... collection of countervailing duties in the instant case violates article I of the GATT. Brazil is entitled to demand that the United States lower its tariffs on Brazilian exports to the U.S. market to compensate for the ... contravention of GATT principles, which would result if this Court grants summary judgment in favor of the government. Since nonrubber footwear was Brazil's largest

export to the United States last year, the American shoe industry is likely to face lower duties on imported Brazilian footwear if compensation is granted—a particularly egregious result for the industry that sought to stem the injurious effects of unfair Brazilian trade. *Id.* The court has granted the defendant leave to file a reply to this representation which states that the GATT panel "expressly limited its report to a general ruling on the matter in dispute without even considering whether the United States should refund or refrain from collecting the countervailing duties and interest assessed upon Brazilian footwear imports", that "even if the panel had recommended that the United States take action to conform its countervailing duty law to the GATT, no action would be required because the contested provisions of the transitional rules (section 104(b) of the Trade Agreements Act of 1979) applied only to countervailing duty orders issued prior to 1980" and that "[t]here was another good reason for the panel not to consider the question whether the United States should compensate Brazil—our countervailing duty law was not applied in a discriminatory manner with respect to non-rubber footwear from Brazil."

## II

■ As stated above, the plaintiffs have pleaded jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2) and 28 U.S.C. § 1581(c), which the defendant challenges as lacking. It argues that the plaintiffs are, in effect, contesting the ITA's earlier determination *sub nom. Non–Rubber Footwear From Brazil; Revocation of Countervailing Duty Order,* 48 Fed.Reg. 28,310 (June 21, 1983), judicial review of which should have been sought within 30 days thereof under section 1516a(a)(2), citing *Belton Industries, Inc. v. United States,* 16 CIT 322 (1992), *aff'd in part, rev'd in part,* 6 F.3d 756 (Fed.Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 925, 127 L.Ed.2d 218 (1994); otherwise, the revocation decision became final and conclusive, citing *Royal Business Machines, Inc. v. United States,* 669 F.2d 692 (CCPA 1982).

Whether or not the determination to revoke could have been contested at the time of its publication as the defendant suggests, plaintiff Footwear states that it did not appeal then

> because it *agreed* with the decision to revoke the countervailing duty order. Plaintiff did not agree that Commerce had the authority to retain estimated countervailing duty deposits and to collect increased countervailing duties on the pre-October 29, 1981 entries. But these issues were first addressed by plaintiff and other interested parties during the course of the administrative review; more importantly, they were first decided in the final determination in that review from which this appeal is taken. Until the final determination was made, the issues decided in that final determination were not ripe for review, and could not have been appealed to this court.[16]

Indeed, the other named plaintiff herein, the Special Commodity Group on Non–Rubber Footwear from Brazil, had sought judicial intervention earlier, before publication of that final determination after administrative review pursuant to 19 U.S.C. § 1675, only to be dismissed. In reaching that conclusion in *Special Commodity Group v. Baldridge,* 6

CIT 264, 269, 575 F.Supp. 1288, 1293 (1983), the court pointed out, among other things, that the ITA had not completed the review of the 1980 entries and that where

> administrative proceedings are in progress, and the agency has not adopted a final decision, the matter is generally not ripe for judicial review. *See Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515–16, 18 L.Ed.2d 681 (1967); *Krupp Stahl AG v. United States,* [4 C.I.T. 244,] 553 F.Supp. 394 (1982). The facts in the instant case indicate that Commerce has not completed the administrative review for the 1980 entries and the possibility exists that the final agency determination may indicate that there were no subsidies, in which event the plaintiff would presumably find no reason to complain. In the interest of efficient agency action, interlocutory determinations should not be considered when final agency decisions are judicially reviewable.

Although denying the Special Commodity Group a writ of mandamus and a preliminary injunction, the court concluded that it was possessed of subject-matter jurisdiction to grant such extraordinary relief, albeit under 28 U.S.C. § 1581(i).

The defendant also attempts to rely on *Cementos Guadalajara, S.A. v. United States,* 12 CIT 307, 686 F.Supp. 335 (1988), *aff'd,* 879 F.2d 847 (Fed.Cir.1989), *cert. denied,* 494 U.S. 1016, 110 S.Ct. 1318, 108 L.Ed.2d 494 (1990), to the effect that the court "agreed that it did not possess jurisdiction to review arguments concerning Commerce's failure to request and require an injury determination before issuing the underlying CVD order". Defendant's Supplemental Memorandum, p. 24. This is true—in that case, but not in this one, which does not contest the 1974 order. Rather, after publication of a final determination pursuant to section 1675, the plaintiffs stand squarely upon 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c), and defendant's claim that this court lacks subject-matter jurisdiction must therefore be dismissed.

---

**16.** Plaintiff's Supplemental Reply to Defendant's [Supplemental] Memorandum in Opposition to

Plaintiff's Motion for Judgment on the Agency Record, pp. 3–4 (emphasis in original).

## III

Of course, the word jurisdiction is a "term of large and comprehensive import" [17] signifying the legal right by which courts exercise their authority. *See, e.g., Mitsuboshi Belting Limited v. United States,* 17 CIT ——, ——, Slip Op. 93–205, at 5–7, 1993 WL 437388 (Oct. 22, 1993), and cases cited therein. At a minimum then, the defendant is contending that the court is without authority to give effect to the 1991 GATT panel decision described in part I–B of this opinion. To recite counsel's most-recent statement:

> ... [T]he Government is arguing that the agency's interpretation of our countervailing duty law should prevail because it is in accordance with the statutory language, the statutory language prevails over any provision of the GATT, and, in interpreting our domestic law, the agency charged with the duty of implementing the law is entitled to deference rather than a GATT panel's opinion of our domestic law. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 [104 S.Ct. 2778, 81 L.Ed.2d 694] (1984); *Suramerica de Aleaciones Laminadas, C.A. v. United States,* 966 F.2d 660 (Fed.Cir.1992); 19 U.S.C. § 2504(a) (stating that no provision of any trade agreement, nor the application of any such provision to any person or circumstance, which is in conflict with any statute of the United States shall be given effect under the laws of the United States); S.Rep. No. 249, 96th Cong., 1st Sess. 36 (1979) (explaining that the intent of section 2504(a) is to preclude any attempt to introduce into U.S. law new meanings which are inconsistent with U.S. legislation and which were never intended by Congress).[18]

The letter articulating this position is part of ongoing discussion between the parties as to the significance herein of *Mississippi Poultry Ass'n, Inc. v. Madigan,* 992 F.2d 1359 (5th Cir.1993), *reh'g en banc* (Jan. 18, 1994). The reported majority opinion in that case quotes the "strongly instructive authority" of the Court of Appeals for the Federal Circuit in *Suramerica de Aleaciones Laminadas, C.A. v. United States,* 966 F.2d 660, 667 (1992), to the effect that "GATT does not trump domestic legislation". *See* 992 F.2d at 1365–66. The plaintiff claims not to disagree with this proposition.[19] It does disagree, however, that the

> *Chevron* doctrine precludes application of the rule established in the *Charming Betsy*—i.e., that ambiguous statutory provisions should be construed, where possible, to be consistent with international obligations of the United States. In fact, in the only reported case discussing a potential conflict between the interpretive principles established in *Chevron* and *Charming Betsy,* the Supreme Court ruled that *Chevron* must yield. Defendant's letter ignores this legal authority in arguing for broad deference under *Chevron.*[20]

## A

■ Brazil is an original signatory of the Subsidies Code, which was approved by the U.S. Congress in its Trade Agreements Act of 1979. *See* 19 U.S.C. § 2503(a) and (c)(5). In accordance with paragraph (b) of that section, Brazil has been a "country under the Agreement" within the meaning of 19 U.S.C. § 1671(b) since then, and, as such, in a letter dated October 23, 1981 it formally requested an injury determination for its footwear covered by the 1974 countervailing-duty order. As set forth in detail in the first GATT panel decision, *supra,* on June 2, 1983 the ITC published its negative determination of material injury *sub nom. Import Investigation of Certain Nonrubber Footwear From Brazil et al.,* 48 Fed.Reg. 24,796, pointing out that it reported this determination to the ITA. That agency thereupon published its notice of revocation of the countervailing-duty order as to all entries made on or after October 29, 1981, the day after ITC receipt of Brazil's

---

17. Black's Law Dictionary, p. 766 (5th ed.1979).

18. Letter of Velta A. Melnbrencis, Esq., first page (Jan. 26, 1994).

19. *See* letter of N. David Palmeter, Esq., first page (Jan. 13, 1994).

20. Letter of N. David Palmeter, Esq., pp. 1–2 (Feb. 4, 1994) (footnote omitted save the citation to *DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council,* 485 U.S. 568, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988)).

letter request. 48 Fed.Reg. 28,310 (June 21, 1983). The notice concluded:

> The ITC's decision and this revocation do not affect shipments of the merchandise entered on or before October 28, 1981. These shipments are subject to the administrative review procedures set forth in section 751 of the Tariff Act of 1930.
>
> This revocation and notice are in accordance with section 104(b)(4)(B) of the TAA (19 U.S.C. 1671 note.)

The section referred to, 104(b)(4)(B), provides:

> NEGATIVE DETERMINATION.— Upon being notified of a negative determination under paragraph (2) by the Commission, the administering authority shall revoke the countervailing duty order then in effect, publish notice thereof in the Federal Register, and refund, without payment of interest, any estimated countervailing duties collected during the period of suspension of liquidation.

Whereupon the plaintiff contends that this language from the 1979 act required the ITA to revoke the order as of the date of the suspension of liquidation, January 4, 1980, and that, even if this statute were not clear, it should be construed so as to be consistent with the international obligations of the United States. Here, that would mean conforming enforcement of its countervailing-duty law to the second GATT panel decision, *supra*. In addition, the plaintiff argues that the statutory language requires the ITA to refund all of the estimated countervailing duties deposited as of January 4, 1980.

The defendant counters that suspension of liquidation follows a request for an injury determination under section 104(b)(3) of the 1979 act and that its transitional rules therefore require refund of estimated countervailing duties deposited only as of the date Brazil's request for an injury test was received.

According to *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984), the initial inquiry is whether Congress has directly spoken to the precise point at issue. "If the intent of Congress is clear, that is the end of the matter; for the court,

as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. at 2781 (footnote omitted). If on the other hand an enactment is ambiguous, a court must determine whether an administrative interpretation is reasonable. *Id.* at 844–45, 104 S.Ct. at 2782–83. If that determination is in the affirmative, the court must "defer, even if it would have come to quite a different view if left to its own devices." *Continental Air Lines v. Dep't of Transportation*, 843 F.2d 1444, 1449 (D.C.Cir.1988). The court need not conclude that the agency's construction is the only reasonable one, or that it would have reached that result had the question arisen before it in the first instance. *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978), citing *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

In support of its position, the defendant refers to the legislative history found in the U.S. Senate Finance Committee's discussion of section 104(b) *viz.*:

> Whenever the Commission receives a request for review under section 104(b), it would promptly notify the administering authority which would suspend the liquidation of entries of the merchandise covered by the order which are made on or after the date of receipt of the Commission's notification....
>
> If the Commission's determination with respect to material injury under section 104(b) is affirmative, the administering authority would liquidate entries of merchandise the liquidation of which has been suspended during the period of the Commission's investigation and impose countervailing duties in the amount of the estimated duties required to be deposited.... If the Commission's determination with respect to material injury upon review is negative, then the administering authority would revoke the countervailing duty order, publish notice of that action in the Federal Register, and refund, without payment of interest, any estimated countervailing duties collected during the period of suspension of liquidation.

**1090**

S.Rep. No. 249, 96th Cong., 1st Sess. 105–06 (1979), 1979 *reprinted in* U.S.Code Cong. & Ad. News 381, 491, 492.

In this court's opinion, the foregoing does not help to clarify the situation. Rather, it appears that Congress did not anticipate the particular circumstances of the entries at issue herein. That is, taking note that on December 7, 1979 the government of Brazil had announced that export payments in the form of IPI credits would be eliminated immediately instead of over a four-year period, the U.S. Treasury, in one of its last ministerial acts before the transfer of administering authority to the ITA, published notice of *suspension of their liquidation*, effective as of January 4, 1980. *See* T.D. 80–12, 45 Fed. Reg. 1,014 (Jan. 4, 1980). Hence, suspension was ordered before Brazil requested an injury test. No doubt Congress anticipated that countries with products already subject to existing countervailing-duty orders under the 1930 Tariff Act would request injury tests, but it seems not to have anticipated (and therefore to have provided in the 1979 act or its transitional rules) that suspension of liquidation would be ordered by the government before receipt of such requests.

Nonetheless, the defendant takes the position that, if Congress

> had, in fact, intended that, in the case of a subsequent negative Commission determination, all entries whose liquidation may have been suspended ... be liquidated without regard to countervailing duties ..., it would have ordered Commerce to "refund ... all estimated countervailing duties collected upon entries which remain unliquidated." Instead, Congress specifically referred to *"the* period of suspension" ... thereby clearly expressing its intent that estimated countervailing duties be refunded only if they were collected during *the* suspension period which Congress has specified in section 104(b)(3).[21]

This contention has some merit. Section 104(c) provides that countervailing-duty orders like the one at bar remain in effect, unless and until notification of a timely negative determination by the ITC of material injury pursuant to subsection (b). On the other hand, that subsection (b) also provides for refund without qualification of "any estimated countervailing duties collected during the period of suspension of liquidation." And in this instance, that suspension was ordained by the defendant—in the aftermath of Brazil's commitment to cease that which had been found countervailable.

The order at bar was issued under section 303 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1303, which provides for imposition of countervailing duties on subsidized dutiable goods without an injury determination, to wit:

> ... [W]henever any country ... shall pay or bestow, directly or indirectly, any bounty or grant upon the manufacture or production or export of any article or merchandise manufactured or produced in such country ... and such article or merchandise is dutiable under the provisions of this Act, then upon the importation of any such article or merchandise into the United States ... there shall be levied and paid ... in addition to the duties otherwise imposed by this Act, an additional duty equal to the net amount of such bounty or grant, however the same be paid or bestowed.

When the United States acceded to GATT in 1947, this section was not in harmony with article VI:6(a) of the General Agreement, which requires that the effect of a subsidy be to cause, or threaten to cause, material injury to an established domestic industry, or to retard materially the establishment of one. Hence, section 303 was "grandfathered" by the GATT Protocol of Provisional Application requiring that the parties thereto undertake to apply article VI "to the fullest extent not inconsistent with existing legislation."[22] By

---

21. Defendant's Supplemental Memorandum, pp. 28–29 (emphasis added in original).

22. *Signed* Oct. 30, 1947, 61 Stat. part 6, p. A2051, para. 1(b), T.I.A.S. No. 1700, 55 U.N.T.S. 308. By way of comparison, section 331 of the Trade Act of 1974, 19 U.S.C. § 1303(a)(2), provides that merchandise otherwise free of duty can be subjected to countervailing duties. However, as this section was not in existence in 1947, it was not sheltered by the protocol and therefore contemplates an injury determination if "required by the international obligations of the

the time at issue herein, section 104 of the 1979 act provided for review by the ITC of countervailing-duty orders imposed under section 303 without injury determinations before (and still in effect on) January 1, 1980. But a country under the Agreement like Brazil had to request an injury determination within three years of the effective date of the act.

If the standard of ensuing judicial review of the administrative reaction to Brazil's timely request in the absence of clearcut congressional circumscription is reasonableness, this court is unable to conclude that the position of the ITA is unreasonable, that is, that levy of countervailing duties on entries from January 4 to December 31, 1980 [23] without an affirmative injury determination is violative of its governing statutory provisions.

## B

■ The question remains, however, whether levy of those duties complies with U.S. obligations under international law. As the plaintiff correctly points out, the Supreme Court has recently stated that its *Chevron* rule may yield to the *Charming Betsy* doctrine:

> ... [S]tatutory interpretation [by an agency] would normally be entitled to deference unless that construction were clearly contrary to the intent of Congress....
>
> Another rule of statutory construction, however, is pertinent here: where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress. [*NLRB v.*] *Catholic Bishop* [*of*

*Chicago,* 440 U.S. 490,] 499–501, 504, [99 S.Ct. 1313, 1318–19, 1320–21, 59 L.Ed.2d 533] [1979]. This cardinal principle has its roots in Chief Justice Marshall's opinion for the Court in *Murray v. The Charming Betsy,* 2 Cranch 64, 118 [2 L.Ed. 208] (1804), and has for so long been applied by this Court that it is beyond debate.

*DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council,* 485 U.S. 568, 574–75, 108 S.Ct. 1392, 1397 (1988). Obligations of this country within the community of nations "must be governed by treaties, international understandings and compacts, and the principles of international law." *United States v. Curtiss–Wright Export Corp.,* 299 U.S. 304, 318, 57 S.Ct. 216, 220, 81 L.Ed. 255 (1936). In that case, the Court distinguished domestic and foreign affairs. As to the former, the national government has specifically enumerated powers, as well as those necessary and proper to effectuate them, which the Constitution deemed "desirable to vest in the federal government, leaving those not included in the enumeration still in the states." *Id.* at 316, 57 S.Ct. at 219, citing *Carter v. Carter Coal Co.,* 298 U.S. 238, 294, 56 S.Ct. 855, 865–66, 80 L.Ed. 1160 (1936). Regarding the latter, as a

> member of the family of nations, the right and power of the United States in that field are equal to the right and power of the other members of the international family. Otherwise, the United States is not completely sovereign.

*Id.* at 318, 57 S.Ct. at 220.

Commensurate with that right and power is adherence to international law, as established by norms and principles which nation states have generally recognized.[24] Ergo,

---

United States." The third domestic countervailing-duty law, section 701 of the Trade Agreements Act of 1979, 19 U.S.C. § 1671, entails an injury determination for both dutiable and duty-free goods from a "country under the Agreement".

23. Judicial review of the ITA's determination as to the remaining period January 1 to October 28, 1981 *sub nom. Non–Rubber Footwear From Brazil; Final Results of Countervailing Duty Administrative Review,* 52 Fed.Reg. 843 (Jan. 9, 1987), awaits this opinion. *See Footwear Retailers of America v. United States,* CIT No. 87–02–00156.

24. *See, e.g.,* The Basis of Obligation in International Law and Other Papers by the late James Leslie Brierly 7–8 (H. Lauterpacht and C.H.M. Waldock eds. 1958):

> ... When we have said that inasmuch as every state is a moral personality, it is endowed by nature with the rights which are necessary to the realization of the purpose of its being, we find that the fact that every state is forced to coexist in the same world as every other state compels us to add that the rights of each are limited by the equal rights of the others, and

this court should attempt to resolve the disagreement at bar so as to avoid any violation, real or apparent, of that obligation. In particular, since the time of creation of this country,

> an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains, and, consequently can never be construed to violate neutral rights, or to affect neutral commerce, further than is warranted by the law of nations as understood in this country.

*Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804). That understanding can be found, for example, in the Restatement (Third) of the Foreign Relations Law of the United States, section 102 of which states:

> (1) A rule of international law is one that has been accepted as such by the international community of states
>
>> (a) in the form of customary law;
>>
>> (b) by international agreement; or
>>
>> (c) by derivation from general principles common to the major legal systems of the world.
>
> (2) Customary international law results from a general and consistent practice of states followed by them from a sense of legal obligation.
>
> (3) International agreements create law for the states parties thereto and may lead to the creation of customary international law when such agreements are intended for adherence by states generally and are in fact widely accepted.
>
> (4) General principles common to the major legal systems, even if not incorporated or reflected in customary law or international agreement, may be invoked as supplementary rules of international law where appropriate.

Article 38(d) of the Statute of the International Court of Justice refers also to

judicial decisions and the teachings of the most highly qualified publicists of the various nations, as subsidiary means for the determination of rules of law.

In this regard, a former judge of the European Court of Justice is reported to have called upon the world of international trade recently to recognize that GATT panel reports

> come out of not a legislative but a contentious process. As such they partake of the legal authority of *res judicata*. In relation to the parties to the dispute, why should *res judicata* not to be carried out before national courts? [25]

In *The Paquete Habana*, 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900), our Supreme Court reiterated:

> International law is a part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction as often as questions of right depending upon it are duly presented for their determination.

The guiding principle for the matter at bar is *pacta sunt servanda*, which section 321 of the Restatement (Third) translates to mean "[e]very international agreement in force is binding upon the parties to it and must be performed by them in good faith." This principle

> lies at the core of the law of international agreements and is perhaps the most important principle of international law. It includes the implication that international obligations survive restrictions imposed by domestic law.[26]

Hence, the general assumption that

> Congress does not intend to repudiate an international obligation of the United States.... Therefore, when an act of Congress and an international agreement ... relate to the same subject, the courts, regulatory agencies, and the Executive

---

each enjoys its own fundamental rights only on condition of respecting those of the others.

**25.** Pescatore, *The GATT Dispute Settlement Mechanism, Its Present Situation and its Prospects*, 27:1 J. World Trade 5, 16 (1993).

**26.** Restatement (Third) of the Foreign Relations Law of the United States, § 321, comment a (1987). *See* Vienna Convention on the Law of Treaties, art. 26, *entered into force* Jan. 27, 1980, 1155 U.N.T.S. 331.

Branch will endeavor to construe them so as to give effect to both.[27]

According to the as yet only published opinion(s) of the Court of Appeals for the Fifth Circuit in *Mississippi Poultry Ass'n, Inc. v. Madigan, supra,* the defendant U.S. Department of Agriculture and its counsel from the Department of Justice in Washington have sought to rely on the country's international obligations, in particular, GATT, the Uruguay Round of Multilateral Trade Negotiations in furtherance thereof, and even the United States–Canada Free Trade Agreement. *See* 992 F.2d at 1365. Here, as quoted above, government counsel may be on a somewhat different slant, namely, the ITA is "entitled to deference rather than a GATT panel's opinion of our domestic law."

Of course, the best perspective is that both are entitled to that degree of respect which their reasonings compel. In this action, as the defendant is well aware, the second panel rendered a general ruling and did not make any specific recommendation. That ruling emanates from GATT itself, which the Restatement (Third) recognizes as "an international agreement, but its status as international law cannot be stated simply. Like other agreements, it is binding upon states that are parties to it".[28]

... Despite some attempts by Congress to distance itself from the Agreement, its status as a commitment of the United States is not in doubt, and courts in the United States assume its binding character.[29]

GATT, including its clause regarding most-favoured nations, became part of U.S. law via executive order[30] in accordance with congressional delegation of power to the President. *See* Reciprocal Trade Agreements Act, as amended and extended, 59 Stat. 410 (1945). And it is well established that an international agreement or treaty which operates without the aid of legislation is "equivalent to an act of Congress and, while in force, constitutes a part of the supreme law of the land." *Chew Heong v. United States,* 112 U.S. 536, 540, 5 S.Ct. 255, 256, 28 L.Ed. 770 (1884), citing *Foster v. Neilson,* 27 (2 Pet.) U.S. 253, 314, 7 L.Ed. 415 (1829). *See also* U.S. Const. art. VI.

Nevertheless, observers report that GATT contracting parties do not automatically accept panel decisions as binding. For example, the European Court of Justice has "refused to grant direct application to the GATT treaty", and the Japanese Supreme Court has affirmed lower court rulings which "concluded that the GATT did not apply". Jackson, *Status of Treaties in Domestic Legal Systems: A Policy Analysis,* 86 Am.J.Int'l L. 310, 333–34 (1992). Another commentator, having examined the dispute settlement system as of 1989, concluded that in eight cases "it can be maintained that the rulings of the Panels have led to an opening-up of markets", "four cases could also be looked upon as achievements for the dispute settlement procedure", in four other cases "the Panel Reports have been adopted but the follow-up has been linked to the outcome of the Uruguay Round negotiations", and "three Panel Reports have not yet been adopted". Nordgren, *The GATT Panels During the Uruguay Round—A Joker in the Negotiating Game,* 25–2 J. World Trade 57, 67–68 (1991). That observer also notes that, in the case of one report,

> the United States ... expressed its opinion that a panel might suggest a particular remedy, for example that the losing party should bring its measures into conformity with its GATT obligations, but not to mandate a particular remedy as the reimbursement of the duties paid. The European Community has supported the American position.

*Id.* at 71. Professor Jackson has concluded that

---

**27.** Restatement (Third) of the Foreign Relations Law of the United States, § 115, comment a, p. 64 (1987).

**28.** *Id.,* vol. 2, p. 264.

**29.** *Id.* at 265 (footnote omitted). *See generally* Jackson, *The General Agreement on Tariffs and Trade in United States Domestic Law,* 66 Mich. L.Rev. 250 (1967).

**30.** *See* Proclamation No. 2761A, 12 Fed.Reg. 8,863 (Dec. 30, 1947).

a court would find great difficulty in directly applying the GATT, with its many elaborate constraints on national government actions in international trade, in circumstances where those GATT norms would also have a higher status than even later-in-time legislation or other acts.

86 Am.J.Int'l L. at 334. Other commentators speculate that, when a panel report is adopted, the United States is obligated "either to: (1) come into conformity with its GATT obligations ...; (2) provide compensatory trade benefits to adversely affected GATT trading partners ...; or (3) suffer the loss of trade concessions made by the adversely affected GATT signatories". Holmer & Bello, *U.S. Trade Law and Policy Series No. 22: Trade and the Environment: A Snapshot from Tuna/Dolphins to the NAFTA and Beyond,* 27 Int'l Law. 169, 173 n. 21 (1993). They also have noted, however, that, under the existing system of GATT dispute settlement, even

> if a report is adopted by the GATT Council, the complaining party has no assurance that the offending party will either come into conformity with its GATT obligations ... or suffer the consequences....

Bello & Holmer, *U.S. Trade Law and Policy Series No. 21: GATT Dispute Settlement Agreement: Internationalization or Elimination of Section 301?,* 26 Int'l Law. 795, 796 (1992).

Such views are based at least in part on the language of the dispute-resolution provisions in the General Agreement [31] and in the Subsidies Code [32] which have not authorized either the GATT Council or the Subsidies Committee to order a contracting party to nullify an offending approach or to refund duties. This approach, however, is in focus in the *Final Act Embodying the Results of the Uruguay Round of Multilateral Trade Negotiations,* GATT Doc. MTN/FA (15 Dec. 1993) ("Final Act"), annexed to which is an Understanding on Rules and Procedures Governing the Settlement of Disputes under GATT articles XXII and XXIII, GATT Doc. MTN/FA II–A2 ("Understanding"). It provides that cessation of measures found to be inconsistent with the General Agreement be the preferred solution (other than settlement) [33] to resolving disputes; that, where a measure is found to be inconsistent with that agreement, a panel or standing appellate body [34] recommend that the measure be brought into conformity with it; that a Dispute Settlement Body ("DSB") keep track of the implementation of recommendations and rulings [35]; and that compensation and suspension of concessions only be temporary measures until the issues raised are resolved or other solutions reached [36].

The Understanding changes the procedure by which panel decisions will be brought to GATT members for disposition. As exemplified by the first panel decision herein, under existing procedure a contracting party has been able to block adoption of a panel report. Per the Understanding, panels will be established at a complaining party's request.[37] It also provides for appeal of their decisions to the standing appellate body. Panel reports will be automatically referred to the DSB for adoption, and shall be deemed adopted unless the DSB decides by consensus not to do so. *See* Understanding, part 16. Notably, however, this significant change is not accompanied by any provision that panel decisions,

---

**31.** Article XXIII:2 thereof states:
... The CONTRACTING PARTIES shall promptly investigate any matter so referred to them and shall make appropriate recommendations to the contracting parties which they consider to be concerned, or give a ruling on the matter, as appropriate....

**32.** Article 18:9 similarly provides:
The Committee shall consider the panel report as soon as possible and, taking into account the findings contained therein, may make recommendations to the parties with a view to resolving the dispute.

**33.** *See generally* Understanding, part 3.

**34.** *See generally id.,* part 17.

**35.** *See generally id.,* part 21.

**36.** *See generally id.,* part 22.

**37.** Article 4.1 of the Understanding states:

If the complaining party so requests, a panel shall be established at the latest at the DSB meeting following that at which the request first appears as an item on the DSB's regular agenda, unless at that meeting the DSB decides by consensus not to establish a panel.

even though affirmed by the appellate body and adopted by the DSB, are binding on the parties.

The contrast comes further into focus when the provisions of the General Agreement and of the Understanding are compared with chapter 19 of the North American Free Trade Agreement [38], which adopts the same chapter in the United States–Canada Free Trade Agreement [39] and specifically provides that decisions of panels reviewing antidumping and countervailing-duty determinations of the three contracting governments are binding. *See* arts. 1904, paras. 9. Moreover, panels constituted under these agreement(s) are empowered to construe the law under which those kinds of duties were levied.[40]

## C

In the matter at bar, the Subsidies Committee panel reports that the government of Brazil stated that "the question of whether the United States procedures in section 104 of the TAA [of 1979] were inconsistent with the U.S. obligations under the Code was not the issue before the Panel." GATT Doc. SCM/94, para. 3.1, p. 4. It had not asked that group to interpret U.S. law, nor did it seek a declaration that the U.S. government had misinterpreted that law. To the contrary, it left such interpretation to this country's courts.[41] The Committee panel also pointed to the limited terms of reference under which it had convened and considered that "the act of suspension of liquidation was of no particular relevance under the provisions of the Code. This issue was a matter related to the conformity of US administrative procedures with US law." *Id.*, para. 4.12.

The second panel made no recommendations as to measure(s) the U.S. government should take to be in compliance with its obligations under the General Agreement. Plaintiff's argument in this regard

is not ... that GATT is superior to domestic law, or that GATT is part of domestic law, or that GATT conflicts with domestic law. It is none of these or any of the other strawmen advanced by defendant. It is an argument that a principle of statutory construction that is a fundamental part of U.S. law requires the U.S. statute at issue in this proceeding to be interpreted in conformity with the international obligations of the United States.

Plaintiff's Supplemental Reply, p. 2.

As stated at the outset, it is the court's province and duty to say what the law is, although this responsibility does not traditionally extend to directing the United States as to how to proceed on the international stage. *But see Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423, 84 S.Ct. 923, 937–38, 11 L.Ed.2d 804 (1964), wherein the Court held that, while

"The conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative ... Departments," ... it cannot of course be thought that "every case or controversy which touches foreign relations lies beyond judicial cognizance"[,]

quoting, respectively, *Oetjen v. Central Leather Co.*, 246 U.S. 297, 302, 38 S.Ct. 309, 310, 62 L.Ed. 726 (1918), and *Baker v. Carr*, 369 U.S. 186, 211, 82 S.Ct. 691, 707, 7 L.Ed.2d 663 (1962). The framers of the Constitution distributed governing powers "naturally" so that those which are "legislative" in character are vested in the Congress, those which are "executive" vest in the President, "with apparently, also, a judicial foreign affairs power lodged in the federal courts." Louis Henkin, Foreign Affairs and the Con-

**38.** *See* 32–3 Int'l Legal Materials 682 (1993).

**39.** *See* 27 Int'l Legal Materials 281 (1988).

**40.** Paragraph 2 of article 1904 states:
An involved Party may request that a panel review, based upon the administrative record, a final antidumping or countervailing duty determination of a competent investigating authority of a Party to determine whether such determination was in accordance with the anti-

dumping or countervailing duty law of the importing Party.

**41.** *See* GATT Doc. SCM/94, para. 3.1. *See also* Stuart, *"I Tell Ya I Don't Get No Respect!": The Policies Underlying Standards of Review in U.S. Courts as a Basis for Deference to Municipal Determinations in GATT Panel Appeals*, 23 Law & Pol'y Int'l Bus. 749 (1992).

stitution 27 (1972). However, the "courts often decline to decide matters of foreign policy ... [and] will avoid the substantive issues by ruling, for example, that the case raises a political question or is otherwise not justiciable." Carter, *Int'l Economic Sanctions: Improving the Haphazard U.S. Legal Regime,* 75 Calif.L.Rev. 1159, 1247 (1987). *See, e.g., Beacon Products Corp. v. Reagan,* 633 F.Supp. 1191 (D.Mass.1986), *aff'd,* 814 F.2d 1 (1st Cir.1987) (required presidential finding of "unusual and extraordinary threat" to trigger sanctions against Nicaragua not justiciable); Michael P. Malloy, Economic Sanctions and U.S. Trade 578 (1990). *See also Baker v. Carr,* 369 U.S. at 211–12, 82 S.Ct. at 707; Alford, *The Extraterritorial Application of Antitrust Law: The United States and European Community Approaches,* 33 Va.J.Int'l L. 1 (1992):

> ... [P]olitical decisions balancing domestic and foreign interests were the prerogative of the executive branch, not the courts. Such criticism echoes the Supreme Court's admonition that while questions implicating foreign policy determinations are not completely beyond the scope of judicial cognizance, courts should be reluctant to review these matters because "resolution of such issues frequently turn[s] on standards that ... involve the exercise of discretion demonstrably committed to the executive or the legislature." .

*Id.* at 12–13, citing *Laker Airways Ltd. v. Sabena Belgian World Airlines,* 731 F.2d 909, 955 (D.C.Cir.1984), and quoting *Baker v. Carr,* 369 U.S. at 211, 82 S.Ct. at 707. *See* Turner, *Application of Competition Laws to Foreign Conduct: Appropriate Resolution of Jurisdictional Issues,* 1985 Ford.Corp. L.Inst. 231, 244 (Hawk ed. 1986). Hence, the courts traditionally refrain from disturbing "the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of foreign

relations". *Curtiss–Wright v. United States,* 299 U.S. at 320, 57 S.Ct. at 220.

This court must do so here. However cogent the reasoning of the GATT panels reported above, it cannot and therefore does not lead to the precise domestic, judicial relief for which the plaintiff prays. That is, that relief simply does not attach. Rather, a party in Brazil's position, having sought and obtained a favorable panel ruling, has and has had relief available to it via suspension of its obligations to the offending party pursuant to Article XXIII [42] of the General Agreement. *See, e.g., Netherlands Measures of Suspension of Obligations to the United States,* 8 Nov. 1952, GATT BISD 32 (1st Supp.1953); *Netherlands Action Under Article XXIII:2 to Suspend Obligations to the United States,* 8 Nov. 1952 (L/61), GATT BISD 62 (1st Supp.1953).

## IV

Having reached the foregoing conclusion, and in the continuing absence of any diplomatic gesture by the parties in interest, this court is constrained to resolve the other, remaining issues raised herein by plaintiffs' motions.

## A

■ In its motion, the plaintiff Special Commodity Group argues that the suspension of liquidation ordered by Treasury was a nullity because by the time of publication thereof on January 4, 1980 responsibility for such matters had been transferred to the ITA and therefore Treasury was without authority to publish the order on January 4th. Commerce, which by then had that authority, did not do so. The Group also argues Treasury issued its order under 19 U.S.C. § 1303 but that section did not empower it to suspend liquidation. Since there has been no

**42.** That article has provided, in part, that if the CONTRACTING PARTIES consider that the circumstances are serious enough to justify such action, they may authorize a contracting party or parties to suspend the application to any other contracting party or parties of such concessions or other obligations under this Agreement as they determine to be appropriate in the circumstances.

As for article 18:9 of the Subsidies Code, if the Committee's recommendations are not followed within a reasonable period, the Committee may authorize appropriate countermeasures (including withdrawal of GATT concessions or obligations) taking into account the nature and degree of the adverse effect found to exist.

valid suspension, there could not have been any extension pursuant to 19 U.S.C. § 1504(b)(2), and that section's one-year time limit having expired, any action taken by the ITA is *ultra vires.* Therefore, Customs should be directed to assess duties as proposed upon entry and to refund any excess collected.

As the defendant notes in its response to these arguments, there is no question that notice as required by section § 1504(c) [43] was given on December 28, 1979 while Treasury still had authority to suspend liquidation, which suspension was to cover merchandise exported on or after December 7, 1979 and entered, or withdrawn from warehouse for consumption, after January 4, 1980.

Publication was merely ministerial; there was no need for the ITA to intercede. Accordingly, the court concludes the suspension order was validly published.

## B

■ In support of its contention that the ITA may not levy increased countervailing duties retroactively against imports from a country under the Agreement, plaintiff Footwear cites *Ambassador Div. of Florsheim Shoe v. United States,* 748 F.2d 1560, 1565 (Fed.Cir.1984), in particular, dicta that "as to an 'agreement country' estimated duties as deposited prior to publication of the review findings could only be reduced, not increased, according to § 1671f(a)". The section referred to, 1671f(a), provides:

**Deposit of estimated countervailing duty under section 1671b(d)(2) of this title.**—If the amount of a cash deposit, or the amount of any bond or other security, required as security for an estimated countervailing duty under section 1671b(d)(2) of this title is different from the amount of the countervailing duty determined under a countervailing duty order issued under section 1671e of this title, then the differ-

ence for entries of merchandise entered, or withdrawn from warehouse, for consumption before notice of the affirmative determination of the Commission under section 1671d(b) of this title, is published shall be—

(1) disregarded, to the extent that the cash deposit, bond, or other security is lower than the duty under the order, or

(2) refunded or released, to the extent that the cash deposit, bond, or other security is higher than the duty under the order.

On its face, this section addresses estimated duties deposited as a provisional measure pending an affirmative injury determination by the ITC where such a determination is required prior to imposition of countervailing duties. However, as the court of appeals noted in *Florsheim,* such a determination is required for non-dutiable merchandise under the 1974 act and dutiable goods from a country under the Agreement under the 1979 act when the countervailing-duty order issued after the effective date of that later statute. This is not true for dutiable merchandise from a country under the Agreement on which an order was imposed pursuant to the 1930 act prior to the effective date of the 1979 act, which is the case here. Also, this action relates to the *levying* of countervailing duties, as opposed to their *imposition,* which occurred in 1974.

The distinction between imposition and levy was addressed in the Subsidies Committee panel report as follows:

4.7 The Panel noted that [in] the interpretation and application of Article VI ... a distinction had been introduced ... between "levy" and "imposition" of a countervailing duty. The term "levy" had been defined ... to mean the definitive or final legal assessment or collection of a duty or tax (Article 4, footnote 14). The term "imposition", although not expressly defined, had been consistently used ... in

---

**43.** Section 1504(b) provides that the "Secretary may extend the period in which to liquidate an entry by giving notice of such extension to the importer, his consignee, or agent in such form and manner as the Secretary shall prescribe in regulations" and, when this occurs, there shall be:

(c) **Notice of suspension.**—If the liquidation of any entry is suspended, the Secretary shall, by regulation, require that notice of such suspension be provided to the importer or consignee concerned and to any authorized agent and surety of such importer or consignee.

the sense of a decision, following the conduct of an investigation, to collect from a specific date a countervailing ... duty on an imported product....

4.8 ... The fact that ... there was no specific reference to pre-existing orders or to any special transitional procedure for such orders which were in force on 1 January 1980 supported the conclusion that the drafters did not intend to restrict respective rights and obligations resulting from Article VI:6(a) of the General Agreement and to require Code signatories to subject these orders to an injury examination automatically as of 1 January 1980.

\*  \*  \*  \*  \*  \*

4.13 ... As previously noted, the Panel was of the view that the final countervailing duty order imposed in 1974 continued to be in force after 1 January 1980 and was not invalidated by the acceptance of the Code by the United States at that date. The duties assessed by the United States after the entry into force of the Code therefore continued to be definitive, rather than provisional, duties and consequently there was, in the view of the Panel, no basis for the application of Article 5.

GATT Doc. SCM/94 (4 Oct. 1989) (footnotes omitted). The analysis set forth in *Ambassador Div. of Florsheim Shoe v. United States, supra,* is therefore apposite here, to wit:

... The merchandise entered normally has passed into the commerce of the United States on the deposit of estimated duties, *a figure which binds neither side,* and is the sum of regular and special duties, as estimated.

A liquidation is "final and conclusive upon all persons (including the United States and any officer thereof)," 19 U.S.C. § 1514(a). By subsection (b) this also applies to other judicially reviewable determinations in countervailing duty cases even if not liquidations....

By 19 U.S.C. § 1504(a), ... an entry not liquidated in one year is "deemed" liquidated, *i.e.,* made final, at the rate claimed on entry. Subsection (b) allows the Secretary to extend the time allowed for liquidation by formal notice of extension to the importer....

This was enacted in 1978, thus only a year before the 1979 Trade Agreements Act.... The prior law had been that Customs might delay liquidation as long as it pleased, and with or without a formal suspension notice.... The ... reason for now requiring prompt liquidation was the uncertainty importers were being kept in, often for years, as to whether they might face further exactions, or when the refunds to which they might be entitled would be paid.... [S]everal countries participating in the multilateral trade negotiations had requested a change in this.

\*  \*  \*  \*  \*  \*

If the ITA's reasoning is not compelling, it is plausible, and its own almost contemporaneous interpretation of § 1504 is an important consideration....

... It is absurd to say that the ITA must investigate annually the subsidies in effect in India or anywhere else, yet to say it cannot act on its factual findings with respect to the very year to which they apply....

748 F.2d at 1562–63 (emphasis added).

In the light of this reasoning, the court concludes that the challenged amounts of the countervailing duties *per se* are in accordance with U.S. law. Moreover, they are not inconsistent with the international obligations of the United States.

### C

▮ Plaintiff Footwear argues that the defendant is guilty of laches because the ITA took more than three and a half years to conclude the administrative review at issue herein.

However, the record documents extensive efforts by the agency to obtain information from Brazil and to conduct on-site verification. It reveals that the review was begun on December 4, 1980, when the ITA sent a letter to the Brazilian embassy in Washington requesting information about preferential financing for exports. Brazil responded with a letter to the U.S. embassy in Brasilia, enclosing a copy of a letter to the ITA regarding the information requested and copies

of relevant regulations and resolutions of its central bank. On February 2, 1981, Brazil sent another letter to the agency, enclosing the resolutions which then governed the program for exports. On February 27, 1981, the ITA forwarded questionnaires for the period December 7, 1979 through December 31, 1980. The Brazilian embassy sent a note on May 11, 1981, enclosing a resolution adopted on April 29, 1981 for "shipments covered by export licenses issued as of 5/4/81." Record Document ("R.Doc") 7, pp. 1–2. On December 1, 1981, the ITA announced a trip to Brazil to verify the questionnaire responses.

The Brazilian embassy expressed concern over the administrative review and on December 15, 1981 proposed an export tax to offset the subsidy as a solution. *See* R.Doc 13. Soon after making this offer, that embassy called for return of the questionnaire responses. The ITA complied. As for the offer, the agency indicated that it was "willing to consider a zero-deposit rate, and settlement for the prior entries at 1%, but only if the domestic footwear industry does not object." R.Doc 18. On April 15, 1982, counsel for two trade unions which had joined with the American Footwear Industries Association (now Footwear Industries of America, Inc. or "FIA") in petitioning for relief opposed settlement and urged the government to "effectively administer the unfair trade laws on our statute books." R.Doc 22, p. 2. Then on May 14, 1982, Brazil's Ministry of Finance indicated an "intention to take steps to fully offset programs which the U.S. Government regards as subsidies." R.Doc 23, p. 2. The ITA was thereafter informed that the government of Brazil had

> determined to impose an export tax on all non-rubber footwear exports to the United States which will completely offset the net subsidies received by footwear export....
>
> The amount of the export tax will be equal to the net subsidy, using the methodology employed by the Commerce Department in reaching its final results in the recently completed administrative reviews of certain castor oil products, cotton yarn, and scissors and shears....

R.Doc 24. A letter from the Brazilian ambassador in Washington on August 4, 1982,

enclosing resolutions 749, 750 and 751 of the central bank, confirmed that exports of such merchandise had been,

> since the 26 of July last, subject to an additional 8% export tax. This additional tax on exports of Brazilian footwear offsets the net subsidy to the industry, and was calculated on the basis of methodology used by the Department of Commerce in the cases of certain castor oil products, cotton yarn, and scissors and shears.

R.Doc 27. FIA reacted as follows:

> The Brazilians ... imposed an embargo on cattlehides in the early seventies. The purpose of the embargo was to hold cattlehides at home, to lower the cost of the raw material to leather producers. These actions, which also served to raise the prices of hides and leather on the world market, give an unfair advantage to leather goods producers over and above the subsidies granted directly to them through other government programs. While the Argentines and Brazilians have had an "agreement" with our government for the past several years which eased the restrictions on cattlehide exports, we understand that these "agreements" have been less than effective and are now in default.

R.Doc 30.

The ITA resumed its administrative review by calling upon Brazil to resubmit the questionnaire responses. As for the allegations of the existence of other export-subsidy programs, the agency sought information by way of a supplemental questionnaire, albeit granting an extension of time to January 7, 1983 to respond because of "the administrative infeasibility of collecting the required information from the large number of firms involved within 30 days." R.Doc 37.

Brazil submitted anew responses to the first questionnaire on November 3, 1982. *See* R.Doc 39. Thereafter, counsel for FIA informed the ITA of certain articles published in the Journal of Commerce to the effect that:

> (1) The Brazilian government has decided to intensify its programs of export subsidization, with budgeted expenses for exports in 1983 rising by 80 percent;

(2) Preferential interest rates for export financing will be maintained, despite a rise in interest rates in other sectors;

(3) The Government of Brazil has decided to increase the pace of cruzeiro mini-devaluations in order to provide exports with a benefit of 18 to 20 percent;

(4) The Government of Brazil has decided to continue the IPI tax credit at the rate of 11 percent *ad valorem;* and

(5) An increase in Brazil's exports of footwear to the United States is a key element in its effort to increase its export earnings. Leather footwear exports were Brazil's leading source of foreign exchange last year.

R.Doc 42.

The ITA provided computations for consideration on February 1, 1983, and on the following day Brazil responded to the supplemental questionnaire. Additional information regarding financing and trading companies was forthcoming on February 14, 1983. *See also* R.Doc 76 (April 6, 1983).

Based on the data produced, the ITA published its preliminary results on March 9, 1983. The agency then sought to verify the questionnaire responses, but Brazil replied

that the terms of [the ITA's] letter are inconsistent with our understanding with the United States regarding verification. We request that this matter be reconsidered and discussed during the visit of Minister Galveas at the end of April.

Since you have requested on-site verification and this request is inconsistent with our past agreement on this matter, we are forced to require a delay in the footwear verification until this matter is resolved. Once this matter has been resolved, the verification can be rescheduled at your convenience.

R.Doc 75. Brazil then tried to assure the U.S. Secretary of Commerce in a letter on April 22, 1983 that

the intention to fully offset the net subsidy on non-rubber footwear exported to the United States is indefinite in duration and will not be affected by revocation by the United States Government of the outstanding countervailing duty order.

R.Doc 77.

The Secretary forwarded this letter to the ITC for use in its injury review. The ITA, however, held to the view "that on-site verifications are necessary . . . if we are to be able to claim that we are enforcing the unfair trade laws vigorously and effectively." R.Doc 81, p. 2. Secretary Baldrige thus reported to Minister Galveas that his Department had "verified virtually all other company data in countervailing duty proceedings on the firms' premises. In our opinion, on-site verification is essential to an effective random examination of all company records". R.Doc 82.

On June 16, 1983, representatives of the Brazilian embassy met with the ITA to report several changes affecting the agency's review and to present arguments against using Commerce's methodology for calculating the benefit. It was later determined that the ITA would start its verification on November 28, 1983, and it led to a report issued on March 20, 1984.

On April 9, 1984, the petitioner responded that

much of the inordinate delay in this review proceeding has been due to the non-cooperation of the Government of Brazil. This fact is sufficient rebuttal to those importers of Brazilian footwear who have claimed prejudice as a result of the delay in this proceeding. Second, Brazil's withdrawal of its initial questionnaire response and its persistent refusal to allow on-site verification call into doubt the basic veracity of Brazil's questionnaire response. These suspicions were in fact borne out when the Department discovered during verification that Brazil had, contrary to express governmental assurances, failed to collect the export tax designed to offset the reimposed IPI export credit premium.

R.Doc 102, pp. 2–3.

In sum, it cannot be held that the record developed supports a claim of laches against the ITA in rendering its determination finally on April 19, 1985. Since that time, of course, plaintiff Footwear sought and ob-

tained leave to take its case to GATT. Moreover, it has failed to show how the passage of time has resulted in prejudice to its interests or that relief would lie if prejudice had, in fact, developed. *Cf. Costello v. United States,* 365 U.S. 265, 281, 81 S.Ct. 534, 542–43, 5 L.Ed.2d 551 (1961); *Guaranty Trust Co. v. United States,* 304 U.S. 126, 132, 58 S.Ct. 785, 788–89, 82 L.Ed. 1224 (1938); *Lane v. United States,* 225 Ct.Cl. 209, 633 F.2d 1384, 1387 (1980).

## D

■ As recognized by the court of appeals in *Ambassador Div. of Florsheim Shoe v. United States, supra,* the Tariff Act of 1930, as amended, contemplates, of necessity, that the actual duties owing will be determined in an administrative review which takes place only after the merchandise subject to that review has been entered. Nevertheless, recently in a case relevant to this question, it was held that "[p]rinciples of fairness prevent Commerce from changing its methodology at [a] late stage" and "[a]dherence to prior methodologies is required in some circumstances." *Shikoku Chemicals Corp. v. United States,* 16 CIT ——, ——, 795 F.Supp. 417, 421 (1992) (citations omitted).

A change in methodology in this action came about in 1984, four years after liquidation was ordered suspended, three years after the ITA had published its notice of intent to conduct administrative reviews of all outstanding countervailing-duty orders, and more than a year after the preliminary results of the review at bar were published in which the subsidy was discussed as follows:

> The commercial rate for short-term working capital is the rate established by the Banco do Brasil for discounting sales of accounts receivable. We choose this as the benchmark rate because information provided by the Government of Brazil indicates that working capital is normally raised within the Brazilian financial system through the sale of accounts receivable.[44]

According to the plaintiff, the ITA used the same approach in reviews of other Brazilian imports[45], and it therefore argues that under such circumstances importers of non-rubber footwear from Brazil could not anticipate the change in methodology used by the agency in its final determination explained as follows:

> ... We agree that the rate offered by the Banco do Brasil alone does not accurately reflect this national average for discounting of cruzeiro accounts receivable. Rates established solely by banks other than Banco do Brasil also do not. We are therefore using a national average rate of both.
>
> We agree that a simple annual rate for discounts of accounts receivable is inappropriate. We have now calculated our benchmark from the national average nominal rate for 30–day discounts of accounts receivable as found in *Analise/Business Trends.* From this rate, we then calculated the compounded annual commercial benchmark.

50 Fed.Reg. at 15,598.

However, unlike in *Shikoku,* the ITA had not found in its preliminary determination that the benefit was *de minimis* and that but-for the change in methodology it would have revoked the underlying countervailing-duty order. Moreover, it cannot be said that the plaintiffs relied on any agency methodology for the imports under review because 1980 was the first year the ITA had administering authority. In fact, the record reveals that the importers ostensibly harmed by unanticipated final margins were aware early that the review might result in greater duties. Indeed, they feared an excess of what might otherwise have been anticipated as the merchandise entered the United States. *See, e.g.,* R.Docs 15, 16, 20. Finally, the length of time between the preliminary and final determinations afforded the parties ample opportunity to be heard with regard to appropriate methodology.

Relying upon *Enron Oil Trading & Transp. Co. v. United States,* 15 CIT 511

---

**44.** *Preliminary Results of Administrative Review of Countervailing Duty Order; Non–Rubber Footwear From Brazil,* 48 Fed.Reg. 9,901, 9,902 (March 9, 1983).

**45.** *See* Plaintiff's Supplemental Memorandum, p. 42, for reference to those proceedings.

(1991), and *Int'l Cargo & Surety Ins. Co. v. United States,* 15 CIT 541, 779 F.Supp. 174 (1991), plaintiff Footwear also contends that the ITA failed to give notice to at least some importers of the actual duties, thus barring their collection. However, it concedes that *Enron* and *Int'l Cargo* "require FDRA to rebut the presumption that Customs provided the required notice". Plaintiff's Supplemental Memorandum, p. 36, n. 66. And it has failed to do this or otherwise show that the change in ITA's methodology was unreasonable. Therefore, this court affirms, as it must [46], the ITA's approach in its final determination of the administrative review at bar.

### E

The defendant formulates the last issue as whether the rate of interest which is payable upon underdeposit of estimated countervailing duties is properly before the court at this time. It arises out of passage of the Trade and Tariff Act of 1984, which was followed by T.D. 85–93 (*Calculation of Interest*), 50 Fed.Reg. 21,832 (May 29, 1985), providing that, in order to implement two provisions of that statute,

> interest on applicable overpayments or underpayments of Customs duties shall be in accordance with the Internal Revenue Code rate established in 26 U.S.C. 6621 and 6622. This determination covers antidumping and countervailing duty payments, and increased or additional duties determined to be due on a liquidation or reliquidation. In addition, it has been determined that a uniform interest payment system should be established and that refunds pursuant to a court determination and payable under 28 U.S.C. 2644, and interest on overpayments and underpayments of estimated excise taxes determined at liquidation, shall be assessed at the rate(s) prescribed under 26 U.S.C. 6621 and 6622.
>
> **EFFECTIVE DATES:** (1) October 30, 1984: For all underpayments and overpayments of countervailing or antidumping duties and all refunds of amounts paid as increased or additional duties which had been determined to be due upon a liquidation or reliquidation.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> ... For underpayments, interest will be computed from the date the initial payment was due to the date full payment is made.

50 Fed.Reg. at 21,832, 21,833.

It is true that, pending this opinion on the other issues raised, Customs has not been directed by the ITA to collect any interest in accordance with the foregoing Treasury decision. Indeed, plaintiff Footwear "agrees with the defendant's statement that this issue may be premature because Customs has not yet asserted any claim for interest." Plaintiff's Supplemental Reply, p. 52.

In hereby concluding to abstain on this issue, the court refers in passing to *Canadian Fur Trappers Corp. v. United States,* 884 F.2d 563, 568 (Fed.Cir.1989), which held that the compound-interest provisions of the 1984 act apply only to that which accrues subsequent to its effective date, November 4, 1984.

### V

To summarize the foregoing, the plaintiffs are not entitled to relief on any of the grounds upon which their motions have been filed, and judgment must therefore be entered dismissing this action.

### JUDGMENT

This consolidated action having been duly submitted for decision; and the court, after due deliberation, having rendered a decision herein; Now, therefore, in conformity with said decision, it is

ORDERED, ADJUDGED and DECREED that the motion of plaintiff Footwear Distributors and Retailers of America, formerly known as Footwear Retailers of America, for judgment upon the record com-

---

**46.** *See, e.g., GMN Georg Muller Nurnberg AG v. United States,* 17 CIT ——, ——, Slip Op. 93–54, at 5, 1993 WL 129804 (April 20, 1993) ("As long as Commerce's 'decision is reasonable, then Commerce has acted within its authority even if another alternative is more reasonable' "), quoting *Koyo Seiko Co. v. United States,* 16 CIT ——, ——, 796 F.Supp. 517, 523 (1992), *rev'd in part on another ground,* 20 F.3d 1160 (Fed.Cir.1994).

piled by the International Trade Administration, U.S. Department of Commerce *sub nom. Non–Rubber Footwear from Brazil; Final Results of Administrative Review of Countervailing Duty Order*, 50 Fed.Reg. 15,-597 (April 19, 1985), be, and it hereby is, denied; and it is further

ORDERED, ADJUDGED and DE-CREED that the motion of plaintiff Special Commodity Group on Non–Rubber Footwear from Brazil, American Association of Exporters and Importers, for summary judgment and judgment upon the record compiled by the International Trade Administration, U.S. Department of Commerce *sub nom. Non–Rubber Footwear From Brazil; Final Results of Administrative Review of Countervailing Duty Order*, 50 Fed.Reg. 15,597 (April 19, 1985), be, and it hereby is, denied; and it is further

ORDERED, ADJUDGED and DE-CREED that any motions of the parties not explicitly discussed or decided in the aforesaid decision be, and each hereby is, deemed to be disposed of in conformity with the aforesaid decision; and it is further

ORDERED, ADJUDGED and DE-CREED that this consolidated action be, and it hereby is, dismissed.