**Slip. Op. 99 – 44**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: RICHARD W. GOLDBERG, JUDGE**

|  |  |
|---|---|
| HYUNDAI ELECTRONICS CO., LTD. AND HYUNDAI ELECTRONICS AMERICA, INC.,<br><br>              Plaintiffs,<br><br>        and<br><br>LG SEMICON CO., LTD. AND LG SEMICON AMERICA, INC.,<br><br>              Plaintiffs,<br><br>              v.<br><br>THE UNITED STATES,<br><br>              Defendant,<br><br>        and<br><br>MICRON TECHNOLOGY, INC.,<br><br>              Defendant-Intervenor. | Cons. Ct. No. 97-08-01409 |

[Plaintiffs' Motions for Judgment on the Agency Record, contesting a U.S. Department of Commerce decision not to revoke an antidumping duty order, are denied.]

Dated: May 19, 1999

Powell, Goldstein, Frazer & Murphy LLP (Lawrence R. Walders) for plaintiffs Hyundai Electronics Co., Ltd., and Hyundai

Electronics America, Inc.

    Kaye, Scholer, Fierman, Hays & Handler, LLP (Michael P. House, Raymond Paretzky, and R. Will Planert), for plaintiffs LG Semicon Co., Ltd., and LG Semicon America, Inc.

    David W. Ogden, Acting Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Kenneth S. Kessler); Office of the Chief Counsel for Import Administration, United States Department of Commerce (Duane W. Layton), of counsel, for defendant.

    Hale & Dorr, LLP (Gilbert B. Kaplan, Michael D. Esch, Paul W. Jameson, and Cris R. Revaz), for defendant-intervenor Micron Technology, Inc.


### OPINION

**GOLDBERG, Judge:** In this action, the Court reviews a decision by the U.S. Department of Commerce ("Commerce") not to revoke an outstanding antidumping ("AD") order on dynamic random access memory semiconductors ("DRAMs") from Korea.  Plaintiffs, LG Semicon Co., Ltd. and LG Semicon America, Inc. (collectively "LG Semicon"), and Hyundai Electronics Co., Ltd. and Hyundai Electronics America, Inc. (collectively "Hyundai"), are Korean producers of the subject merchandise and seek relief from Commerce's action under USCIT Rule 56.2.  During the underlying administrative proceeding, plaintiffs separately asserted that the regulatory requirements for revocation had been met, and

requested that Commerce revoke the outstanding AD order.

Commerce rejected each invitation in its <u>Notice of Final Results</u>

<u>of Antidumping Duty Administrative Review: Dynamic Random Access</u>

<u>Memory Semiconductors of One Megabit or Above From the Republic</u>

<u>of Korea</u>, 62 Fed. Reg. 39,809 (July 24, 1997) ("<u>Final Results</u>").

Plaintiffs contest this determination as both contrary to law and

unsupported by substantial evidence.

The Court exercises jurisdiction to review the motions for

judgment on the agency record pursuant to 28 U.S.C. § 1581(c)

(1994).  The Court sustains the <u>Final Results</u>.


**I.**

**BACKGROUND**

Micron Technology, Inc. ("Micron"), a U.S. manufacturer of

DRAM semiconductors, filed a petition with Commerce in April,

1992, alleging that Korean producers were selling DRAMs in the

United States at less than fair value.  Following an antidumping

investigation, Commerce published an AD order on DRAMs from Korea

in May, 1993.  <u>See</u> 58 Fed. Reg. 27,520 (May 10, 1993).

In the first anniversary month of the AD order, plaintiffs

and Micron both requested an administrative review.  Commerce

found <u>de minimis</u> dumping margins for both plaintiffs in this

review.  See Notice of Final Results of Antidumping

Administrative Review of DRAMs from the Republic of Korea, 61

Fed. Reg. 20,216 (May 6, 1996).[1]  In the second anniversary

month, the parties requested another administrative review, and

Commerce again found de minimis dumping margins for both LG

Semicon and Hyundai.  See Notice of Final Results of Antidumping

Administrative Review of DRAMs from the Republic of Korea, 62

Fed. Reg. 965 (Jan. 7, 1997).[2]

---

[1] In January, 1998, this Court remanded to Commerce one aspect of the first review that impacts LG Semicon.  See Micron Tech., Inc. v. United States, No. 99-12 (CIT Jan. 28, 1999). Commerce filed its remand results on March 31, 1999.  Although the Court has yet to take action on this remand determination, the Court notes that Commerce again found LG Semicon's margins de minimis.

[2] As with the first administrative review, this Court remanded to Commerce one aspect of the second administrative review pertaining to LG Semicon.  See Micron Tech., Inc. v. United States, No. 99-29 (CIT Mar. 25, 1999).  As a result of Commerce's decision on remand, it is foreseeable that LG Semicon's margins for the second review period will exceed de minimis levels.  If this is the case, then LG Semicon will not have had de minimis dumping margins for three consecutive years, the first of three criteria for revocation, see 19 C.F.R. § 353.25(a)(2), and its arguments on appeal will become moot. The remand results for the second review will not become final, however, until the Court sustains the results and until the time for appeal has run.  In addition, no party to this action has moved to stay these proceedings to await Commerce's remand findings.  And, the Court notes that stays pending an appeal or other judicial proceeding are an "extraordinary and disfavored measure."  See Gerald Metals, Inc. v. United States, 22 CIT __,

In the third anniversary month of the order, plaintiffs requested both a third annual review and a revocation in part of the AD order, pursuant to 19 C.F.R. § 353.25(a)(2) of Commerce's regulations.  Notice of Initiation of Administrative Review: DRAMs from Korea, 61 Fed. Reg. 32,771 (June 25, 1996) (covering the period May 1, 1995 through April 30, 1996).  In pertinent part, section 353.25(a)(2) provides that Commerce may revoke an order if it concludes that

> (i) One or more producers or resellers
> covered by the order have sold the
> merchandise at not less than foreign market
> value for a period of at least three
> consecutive years;
>
> (ii) It is not likely that those persons will
> in the future sell the merchandise at less
> than foreign market value; and
>
> (iii) ... the producers or resellers agree in
> writing to their immediate reinstatement in
> the order, as long as any producer or
> reseller is subject to the order, if the
> Secretary concludes ... that the producer or
> reseller, subsequent to the revocation, sold
> the merchandise at less than foreign market

---

__, 27 F. Supp.2d 1351, 1354 n.6 (1998) (citing Phillip Bros. v. United States, 10 CIT 448, 453, 640 F. Supp. 261, 265 (1986)). Thus, notwithstanding that LG Semicon's suit potentially could become moot, at this time it presents a genuine controversy. Therefore, the Court issues this opinion with respect to LG Semicon as well as Hyundai (to which the potential problem does not apply).

value.

19 C.F.R. § 353.25(a)(2) (1996).[3]

Commerce issued the preliminary results of its third review on March 18, 1997.  See Preliminary Results of Antidumping Duty Administrative Review and Notice of Intent Not to Revoke Order: Dynamic Random Access Memory Semiconductors of One Megabit or Above From the Republic of Korea, 62 Fed. Reg. 12,794 (Mar. 18, 1997).  Commerce again found de minimis dumping margins for both plaintiffs during the third review period.  Commerce preliminarily determined not to revoke the AD order, however,

---

[3] Because Commerce initiated the third review after January 1, 1995, the agency conducted the review under the antidumping law as amended by the Uruguay Round Agreements Act ("URAA"), Pub. L. No. 103-465, tit. II, 108 Stat. 4808, 4842 (1994).  Among other things, the URAA revised certain terminology, including substituting the term "normal value" for the term "foreign market value."  Yet, at the time Commerce initiated the third review in June, 1996, Commerce's revised regulations, intended to reflect the URAA amendments, had yet to take effect.  See Notice of Final Rule: Antidumping and Countervailing Duties, 62 Fed. Reg. 27,296 (May 19, 1997) (noting that June 18, 1997 was the effective date of the new regulations).  Therefore, the 1996 regulations in effect during the underlying proceeding employed the pre-URAA terminology, i.e., "foreign market value," and that language is used throughout this opinion.  Also, all parties to the action concede that the URAA did not alter the revocation statute nor did Commerce alter the substantive criteria in its revocation regulation.  Currently, the regulation that governs revocation may be found at 19 C.F.R. § 351.222(b)(2) (1998).

because in its view plaintiffs each failed to meet the second of the three revocation criteria.  That is, plaintiffs failed to satisfy Commerce that they were "not likely" to dump in the future.  Commerce based its preliminary determination in part on evidence submitted by Micron regarding market trends during 1996. Importantly, Micron's data included information for the period after April 30, 1996, i.e., the last day covered under the third administrative review.  In the Final Results, Commerce affirmed its decision not to revoke the AD order.  See 62 Fed. Reg. at 39,811.

Plaintiffs challenge Commerce's decision not to revoke the order, alleging that it was neither in accordance with law nor supported by substantial evidence.  More specifically, both plaintiffs assert that, as a matter of law, Commerce did not apply the proper standard to determine the likelihood of future dumping nor did it use data from an appropriate time period when it applied its faulty standard.  Hyundai further challenges Commerce's characterization of the DRAM market and of Hyundai's behavior in that market as inconsistent with the record evidence. LG Semicon also challenges various conclusions regarding LG Semicon's current and future activities in the DRAM market as

unsupported by record evidence.

Commerce opposes all of plaintiffs' challenges, as does Micron.

## II.
## STANDARD OF REVIEW

Commerce's determination will be sustained if it is supported by substantial evidence on the record and is otherwise in accordance with law.  See 19 U.S.C. § 1516a(b)(1)(B) (1994).

To determine whether Commerce's interpretation of the statute is in accordance with law, the court applies the two-prong test set forth in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).  Chevron first directs the court to determine "whether Congress has directly spoken to the precise question at issue."  Id. at 842-43 (internal quotations omitted).  In doing so, the court must inquire "whether Congress's purpose and intent on the question at issue is judicially ascertainable."  Timex V.I., Inc. v. United States, __ Fed. Cir. (T) __, __, 157 F.3d 879, 881 (1998) (citing Chevron, 467 U.S. at 842-43 & n.9); see also Micron Tech., Inc. v. United States, No. 99-12, slip op. at 4-5 (CIT Jan. 28, 1999). Congress's purpose and intent must be divined using the traditional tools of statutory construction.  Timex, 157 F.3d at

882 (citation omitted).  Of course, the "first and foremost tool to be used is the statute's text," and "if the text answers the question, that is the end of the matter."  Id. (citations and internal quotation omitted).  In addition to the plain language of the statute, the other tools include the statute's structure, canons of statutory interpretation, and legislative history.  See id. (citing Dunn v. Commodity Futures Trading Comm'n, 117 S.Ct. 913, 916-20 (1997)); Chevron, 467 U.S. at 859-63; Oshkosh Truck Corp. v. United States, 123 F.3d 1477, 1481 (Fed. Cir. 1997)).  If, using these tools, Congress's intent is unambiguous as to the issue at hand, the court must give effect to that intent.

On the other hand, if Congress's intent is "silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."  Chevron, 467 U.S. at 843.  Thus, the second prong of the Chevron test directs the court to consider the reasonableness of an agency's interpretation.

If asked to review Commerce's factual findings, the court will uphold the agency if its findings are supported by substantial evidence.  "Substantial evidence is something more

than a 'mere scintilla,' and must be enough reasonably to support a conclusion."  Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 405, 636 F. Supp. 961, 966 (1986), aff'd, 5 Fed. Cir. (T) 77, 810 F.2d 1137 (1987).  In applying this standard, the court sustains Commerce's factual determinations so long as they are reasonable and supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusions.  See Atlantic Sugar, Ltd. v. United States, 2 Fed. Cir. (T) 130, 138, 744 F.2d 1556, 1563 (1984).

## III.
### DISCUSSION

In the discussion below, the Court first reviews plaintiffs' argument that Commerce's application of the "not likely" standard was not in accordance with law.  The Court then considers plaintiffs' claim that Commerce unlawfully examined an inappropriate time period to make its "not likely" determination. In both instances, the Court rejects plaintiffs' arguments.  The Court concludes its discussion by considering plaintiffs' claims that Commerce's decision not to revoke the order was unsupported by substantial evidence.  Here, too, the Court sustains Commerce's determination.

A.    **"Not Likely" Standard**

Plaintiffs first argue that Commerce applied an improper standard to determine whether plaintiffs were "not likely" to dump in the future.  Each plaintiff advances a different theory, however.  Hyundai contends that since Commerce adopted 19 C.F.R. § 353.25(a)(2)(ii) in 1989, the agency has granted revocation in virtually every case where a respondent has established three consecutive years of no dumping and has furnished the required agreements.  See Pl.'s (Hyundai's) Br. in Supp. of Mot. for J. on Agency R. at 9 n.5 ("Hyundai's Br.") (citing fourteen determinations between 1990 and mid-1997 where Commerce granted revocation).  Hyundai thus maintains that respondents who meet these criteria should not be denied revocation barring extremely unusual circumstances, which it asserts do not exist in this case.

In addition, Hyundai argues that Commerce's final determination in this case imposes a nearly impossible standard for revocation of AD orders on merchandise sold in cyclical markets.  Hyundai asserts that Commerce presumes market downturns in cyclical industries always lead to dumping.  Specifically, Hyundai points to the Final Results, where Commerce stated that

"[t]he DRAM industry is highly cyclical in nature with periods of sharp upturn and downturn in market prices," and then noted that "because DRAMs are currently a commodity product, DRAM producers/resellers must price aggressively during a downturn period in order to stay competitive and maintain their customer base."  Final Results, 62 Fed. Reg. at 39,810.  Commerce then went on to find that "it is reasonable to conclude that information regarding the selling activities and pricing patterns of the respondents, as well as other market conditions, during periods of significant downturn are relevant to whether dumping is not likely to occur in the future."  Id.  According to Hyundai, if the assumption that market downturns automatically lead to dumping is accepted, it will effectively make it impossible to revoke AD orders on products sold in cyclical markets because, by definition, there will be market downturns.

LG Semicon also challenges Commerce's use of the "not likely" standard in the instant case, although on different grounds.  LG Semicon argues Commerce ignored the plain meaning of the regulation when it found LG Semicon did not meet the "not likely" criterion.  LG Semicon asserts that future dumping is "not likely" if the chance that respondent will not dump in the

future is greater than the chance that respondent <u>will</u> dump in
the future.  Therefore, LG Semicon contends Commerce should
revoke an AD order if it finds at least a 51% chance that
respondent will not dump in the future.  And LG Semicon argues
that, contrary to this proposed standard, Commerce applied a more
rigorous test to ascertain whether it was "not likely"
respondents would dump in the future.  In doing so, LG Semicon
maintains Commerce's decision was contrary to law.

The Court first addresses the standard under which these
arguments are reviewed.  In Section 751(c) of the Trade
Agreements Act of 1979, Pub. L. No. 96-39, tit. I, § 101, 93
Stat. 144, 176 (1979), Congress provided that Commerce, as the
administering authority, "may revoke, in whole or in part, a
countervailing duty order or an antidumping duty order or
finding, or terminate a suspended investigation, after [an
administrative review]".  <u>See</u> 19 U.S.C. § 1675(d)(1).  Although
Congress offered no further guidance to assess when revocation
might be appropriate, Commerce has promulgated its own series of
regulations to fulfill the statutory mandate.[4]  In this case,

---

[4] Commerce published its initial regulation to guide
operation of the revocation statute in 1980.  <u>See</u> <u>Final Rule:</u>
<u>Antidumping Duties</u>, 45 Fed. Reg. 4932 (Feb. 6, 1980).  Then, as

neither plaintiff contends that section 353.25(a)(2) itself is at odds with the statute's intent.  Rather, plaintiffs contest Commerce's application of the regulation.  Thus, the Court must consider whether Commerce's actions were reasonable.

    **i.    Commerce is Not Automatically Required to Revoke an Antidumping Order Where Respondent Has Not Dumped for Three Consecutive Years and Has Furnished the Requisite Agreements.**

Hyundai maintains that except in extraordinary cases, Commerce should automatically revoke an AD order when respondent can show three years of no dumping and has furnished the required no-dumping agreements.  This argument lacks merit.  Hyundai's assertion ignores both the language of the statute and the regulation.  First, the statute expressly states that Commerce "<u>may</u> revoke, in whole or in part, . . . an antidumping duty order."  19 U.S.C. § 1675(d)(1) (emphasis added).  Similarly, the regulation provides that Commerce "<u>may</u> revoke an order in part" if the three criteria for revocation have been met.  19 C.F.R. § 353.25(a)(2) (emphasis added).  The use of the word "may" affords Commerce the discretion not to revoke an order even if all three

---

noted earlier, Commerce issued revised regulations in 1989.  <u>See</u> <u>supra</u> text accompanying note 3.  The current regulation that governs revocation can be found at 19 C.F.R. § 351.222(b)(2).

criteria are satisfied.  Indeed, the court has held that the pre-1989 incarnation of the regulation, 19 C.F.R. § 353.54 (1988), which similarly stated that Commerce "may act to revoke" when certain conditions were met, indicates that "Commerce is not compelled to grant revocation" even where plaintiffs satisfy the requirements.  Toshiba Corp. v. United States, 12 CIT 455, 463, 688 F. Supp. 617, 623 (1988), aff'd, 7 Fed. Cir. (T) 13, 861 F.2d 257 (1988); see also Tatung Co. v. United States, 18 CIT 1137, 1144 (1994) (finding that the "second requirement for revocation, that the respondent is not likely to resume dumping, necessarily involves an exercise of discretion and judgment").

Second, the regulation plainly establishes a three-part test for revocation, not a two-part test.  Contrary to Hyundai's argument, the second prong of the regulation, i.e., the "not likely" exercise, is an independent criterion that must be established to Commerce's satisfaction to attain revocation. Thus, the plain language of the statute and the regulation refutes Hyundai's argument that Commerce acted contrary to law when it denied revocation even though respondent established three consecutive years of no dumping and furnished the requisite agreements.

**ii.  Commerce's Application of the "Not Likely" Standard
Allows for the Possibility That an Outstanding Order on
a Product Sold in a Cyclical Market May Be Revoked.**

Hyundai next asserts that Commerce's application of the "not

likely" standard makes it impossible for an AD order to be

revoked in a cyclical industry.  The record and Commerce's past

practice belie this argument.  First, Commerce did not simply

decide that because the DRAM industry is cyclical, Hyundai and LG

Semicon are likely to dump in the future; rather, in its effort

to predict whether resumption of dumping is not likely, Commerce

examined the history of companies in the DRAM industry - and this

industry only - to determine how those companies react to market

downturns.  It noted that

> [i]n the past, the DRAM industry has been characterized
> by dumping during periods of significant downturn.  For
> instance, various foreign producers were found to have
> dumped in the mid-1980s, and the Korean respondents in
> this proceeding were found to have dumped in the less
> than fair value investigation during 1991-1992, the
> last period when there was a significant downturn in
> the DRAM industry.

Final Results, at 39,810 (citation omitted).  Commerce then

stated that "it is reasonable to conclude that information

regarding the selling activities and pricing practices of

respondents, as well as other market conditions, during periods

of significant downturn are relevant to whether dumping is not

likely to occur in the future."  Final Results, at 39,810
(emphasis added).  Importantly, some of the other market
conditions Commerce considered were (1) spot pricing and company-
specific pricing data for 1996 and 1997, (2) production and
inventory data for 1996 and 1997, and (3) industry reports on the
general health of the DRAM industry for both 1996 and 1997.  See
Final Results, at 39,817-19; see also discussion infra Section
III.C (finding that Commerce's decision on this matter was based
on substantial evidence).  Thus, summary review of the Final
Results demonstrates that Commerce did not base its "not likely"
decision on the mere fact that DRAMs are sold in a cyclical
market.  Rather, Commerce considered respondents' historical
selling and pricing behavior in addition to other market
conditions.  Consequently, the record here does not support the
conclusion that Commerce will automatically find future dumping
is likely where there is a cyclical market.

     Second, Commerce has, in at least one instance, revoked an
AD order on products sold in a cyclical market.  In Frozen
Concentrated Orange Juice from Brazil, 56 Fed. Reg. 52,510 (Oct.
21, 1991), Commerce revoked an order even though the merchandise
at issue was commodity based and sold in a highly cyclical

market.  In that case, Commerce identified three years of price fluctuations in a cyclical market but discerned no correlative trend between dumping and market downturns.  Id. at 52,511. Thus, Commerce has revoked an AD order involving a cyclical industry in the past, and nothing in the instant case indicates that Commerce is precluded from doing so in the future.

### iii. The Plain Language of the Regulation Does Not Require Commerce to Use a Set Numerical Threshold to Assess Whether Future Dumping is "Not Likely."

Turning to LG Semicon's argument, the Court finds that Commerce's application of the "not likely" standard did not contravene the regulation's plain language.  LG Semicon maintains the phrase "not likely" requires Commerce to find a greater-than-fifty-percent chance that dumping will occur before it may deny a request for revocation.  The Court does not agree.  The "not likely" calculus is not a mathematical formula, but rather a fact-intensive, case-by-case determination.  Within reason, Commerce has the discretion to apply the "not likely" standard as it deems fit.  And, as Commerce points out, the proposed greater-than-fifty-percent standard would be difficult if not impossible to administer.  In addition, the court has held that Commerce "need not affirmatively find that LTFV sales are likely[,] to be

unsatisfied that there is no likelihood of LFTV sales."  Toshiba

Corp. v. United States, 15 CIT 597, 600 (1991).[5]  In other words,

even if Commerce cannot or does not find that LTFV sales are

likely to occur, it can still, within its discretion, reject a

respondent's claim that it is "not likely" to make LTFV sales in

the future.  Therefore, Commerce reasonably exercised its

discretion when it applied the "not likely" standard in this

case.

###    iv.    Commerce's "Not Likely" Requirement is Consistent With International Obligations.

In ancillary fashion, LG Semicon contends that Commerce's

"not likely" standard is at odds with U.S. international

---

[5] In 1989, Commerce substituted the phrase "not likely" for "no likelihood."  19 C.F.R. § 353.25(a)(2)(ii) (1989).  Yet, the Toshiba case involved a pre-1989 revocation review and, hence, the phrase "no likelihood" instead of "not likely" was dispositive there.  See 15 CIT at 600.  When Commerce revised its regulation in 1989, Commerce gave no explanation for the change in phraseology; indeed, the agency has continued to use the two phrases interchangeably in its rulings. See, e.g., Final Results, 62 Fed. Reg. at 39,812-13; see also Wieland-Werke v. United States, 22 CIT __, __, 4 F. Supp.2d 1207, 1211 (1998) (holding that the phrases "no likelihood" and "not likely" have the same meaning in determining whether exporters will resume dumping). While the Court here has no occasion to revisit whether distinctions between the two phrases result in variant standards, to avoid confusion, the Court urges Commerce to refrain from using the "no likelihood" phrase in future revocation decisions when it means "not likely."

obligations.[6]  Although not adequately addressed by the parties, this issue merits more than cursory analysis due in large measure to a World Trade Organization ("WTO") panel report that addressed the same question.[7]

When asked to review the same underlying administrative decision, a WTO dispute settlement panel recently found that Commerce's "not likely" requirement violates WTO rules.  See WTO Dispute Panel Report: United States - Anti-Dumping Duty on DRAMs of One Megabit or Above from Korea, 1999 WL 38403 (WTO Jan. 29, 1999, adopted March 19, 1999) ("Korean DRAMs WTO Report").

---

[6] In a footnote to its principal brief, LG Semicon argued that Commerce violated U.S. international obligations through its application of the "not likely" standard.  See Pl.'s (LG Semicon's) Br. in Supp. of Mot. for J. on Agency R. at 14 n.4 ("LG Semicon's Br.").  For its part, Hyundai only alludes to U.S. international obligations in its principal brief when it argues that Commerce's alleged policy of automatic revocation after three years of no dumping is consistent with its international obligations.  See Hyundai's Br. at 9.  Only in its reply brief does Hyundai make the express claim that Commerce's "not likely" standard is inconsistent with international obligations -- and even then it does so in just one sentence.  See Pl.'s (Hyundai's) Reply Br. in Supp. of Mot. for J. on Agency R. at 6.

[7] Although the WTO issued its report after the briefing period concluded in the case at bar, no party moved to file supplemental briefs.  Nevertheless, the Court takes judicial notice of the fact that the WTO panel published a report examining the same issue because it is particularly relevant to the scope of U.S. international obligations.

Although the WTO panel rejected the "not likely" approach, it

declined to suggest that the United States should act to revoke

the Korean DRAMs order.  Rather, the panel concluded that the

United States has a "range of possible" options to implement its

recommendation.  Korean DRAMs WTO Report, 1999 WL 38403, at *151.

     For purposes here, however, the salient point is that the

WTO panel found the "not likely" standard inconsistent with

Article 11.2 of the WTO's Agreement on Implementation of Article

VI of the 1994 General Agreement on Tariffs and Trade (the

"Antidumping Agreement").  Article 11.2 provides as follows:

> The authorities shall review the need for continued
> imposition of the duty, where warranted, on their own
> initiative or, provided that a reasonable period of
> time has elapsed since the imposition of the definitive
> antidumping duty, upon request by any interested party
> which submits positive information substantiating the
> need for a review.  Interested parties shall have the
> right to request the authorities to examine whether the
> continued imposition of the duty is necessary to offset
> dumping, whether the injury would be <u>likely</u> to continue
> or recur if the duty were removed or varied, or both.
> If, as a result of the review under this paragraph, the
> authorities determine that the antidumping duty is no
> longer warranted, it shall be terminated immediately.

Antidumping Agreement, art. 11.2 (emphasis added).  In essence,

the WTO panel concluded that the "not likely" approach results in

a more rigorous standard for respondents than the "likely"

approach embodied in Article 11.2.  Korean DRAMs WTO Report, 1999

WL 38403, at *141.  More precisely, the panel reasoned as

follows:

> 6.45  We consider that a failure to find that an event
> is "not likely" is not equivalent to a finding that the
> event is "likely."   We see a clear conceptual
> difference between establishing something as a positive
> finding, and failing to establish something as a
> negative finding.  It is perfectly possible that one
> could not determine that someone was unlikely to dump
> and find that they were also likely to dump.  But the
> former determination does not, in and of itself, amount
> to a demonstrable basis for concluding the latter.
> This is evident from the fact that the former finding
> is manifestly compatible also with the reverse of the
> latter situation, i.e., it is perfectly logical to find
> that you cannot determine that someone is unlikely to
> dump, yet also be unable to determine that they were
> actually likely to dump.  In other words, determining
> something is not "not likely" is entailed by, but does
> not itself entail, that something is likely.
>
> 6.46 . . . .
>
> 6.47 Given this reality, it is a priori possible that
> situations could arise where the not "not likely"
> criterion is satisfied but where the likelihood
> criterion is not satisfied. Reliance on the not likely
> criterion clearly fails to provide any reliable means
> to avoid or preclude this flaw.  Given such a
> fundamental flaw, it cannot constitute a demonstrable
> basis for consistently and reliably determining that
> the likelihood criterion is satisfied.

Korean DRAMs WTO Report, 1999 WL 38403, at *141-42.

As an initial matter, the WTO report itself has no binding

effect on the court.  In Footwear Distributors and Retailers of

America v. United States, 18 CIT 391, 852 F. Supp. 1078 (1994),

the court was confronted with a claim that an adopted GATT panel decision should govern the outcome of the case.  Upon thorough review, the Footwear Distributors court reasoned that the response to a panel report is the prerogative of the executive branch, not the judiciary, because it implicates political decisions.  Id. at 414, 852 F. Supp. at 1096.  "[T]he courts traditionally refrain from disturbing the 'very delicate, plenary and exclusive power of the [executive] as the sole organ of the federal government in the field of foreign relations.'"   Id. (quoting United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 320 (1936)).  The Footwear Distributors court therefore concluded that "[h]owever cogent the reasoning of the GATT panel[]" judicial relief from this court does not attach.  Id.

    While Footwear Distributors concerned an adopted GATT panel report, the same principles apply to the WTO report at issue here.  Most importantly, Congress made this clear when it codified the principles espoused in Footwear Distributors as part of the URAA.  Specifically, Congress provided that the response to an adverse WTO panel report is the province of the executive branch and, more particularly, the Office of the U.S. Trade Representative.  See URAA § 129 (codified as 19 U.S.C. § 3538).

Thus, the WTO panel report does not constitute binding precedential authority for the court.  Of course, this is not to imply that a panel report serves no purpose in litigation before the court.  To the contrary, a panel's reasoning, if sound, may be used to inform the court's decision.

The Antidumping Agreement, on the other hand, is a different matter.  When it enacted the URAA, the Senate noted that the Uruguay Round Agreements, including the Antidumping Agreement, "are not self-executing and thus their legal effect in the United States is governed by implementing legislation."  S. Rep. No. 103-412, at 13 (1994); accord H.R. Rep. No. 103-826, pt. I, at 25 (1994).  Nevertheless, as a signatory to the Uruguay Round agreements, the United States has obligations under these agreements irrespective of whether the agreements are self-executing.  See Federal-Mogul Corp. v. United States, __ Fed. Cir. (T) __, __, 63 F.3d 1572, 1581 (1995) (noting that GATT agreements, including the Uruguay Round agreements, are international obligations); Footwear Distribs., 18 CIT at 410, 852 F. Supp. at 1093 (same).  Indeed, the Statement of Administrative Action to the URAA, H.R. Doc. No. 103-316 (1994), at 669, provides that the URAA was "intended to bring U.S. law

fully into compliance with U.S. obligations under [the Uruguay Round] agreements." Accordingly, the Antidumping Agreement is properly construed as an international obligation of the United States.

When confronted with a conflict between an international obligation and U.S. law, it is of course true that an unambiguous statute will prevail over the international concern. See, e.g., Federal-Mogul, __ Fed. Cir. (T) at __, 63 F.3d at 1581; Suramerica de Aleaciones Laminadas, C.A. v. United States, 10 Fed. Cir. (T) 74, 83, 966 F.2d 660, 668 (1992). Yet, absent express language to the contrary, a statute should not be interpreted to conflict with international obligations. This time-honored canon of statutory construction was first applied by Chief Justice Marshall in Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 64 (1804).

> It has also been observed that an act of Congress ought never to be construed to violate the law of nations, if any other possible construction remains, and consequently can never be construed to violate neutral rights, or to affect neutral commerce, further than is warranted by the law of nations as understood in this country.

> These principles are believed to be correct, and they ought to be kept in view in construing the act now under consideration.

Id. at 118; see also Federal-Mogul, __ Fed. Cir. (T) at __, 63
F.3d at 1581; Footwear Distribs., 18 CIT at 408, 852 F. Supp. at
1091.  And, Chevron must be applied in concert with the Charming
Betsy doctrine when the latter doctrine is implicated.  See
DeBartolo Corp. v. Florida Gulf Coast Bldg. and Constr. Trades
Council, 485 U.S. 568, 574-75 (1988).

Here, Congress was silent on the mechanics of the revocation
procedure.  Commerce acted to fill the void and, in doing so,
promulgated the "not likely" requirement.  Meanwhile, as
described earlier, Article 11.2 of the Antidumping Agreement also
outlines procedures for revocation and provides that, in deciding
whether to revoke an outstanding order, a signatory may consider
whether dumping is "likely to continue or recur if the duty were
removed."  Because Congress declined to enact procedures for
revocation, under the Charming Betsy doctrine, the Court must
consider whether Commerce formulated its regulation consistent
with Article 11.2 of the Antidumping Agreement.

Commerce fulfilled its statutory mandate in consonance with
U.S. international obligations.  As a general matter, Article
11.2 of the Antidumping Agreement provides the administering
authority discretion to determine whether revocation is

appropriate.  See Antidumping Agreement, art. 11.2 (stating that

"[i]f, . . ., the authorities determine that the antidumping duty

is no longer warranted, it shall be terminated immediately"

(emphasis added)).  It follows that the administering authority

also has discretion to determine whether injurious dumping would

be "likely" to occur in the future.  And, as the WTO panel aptly

noted,

> the certainty inherent to such a prospective analysis
> could be conceivably somewhat less than that attached
> to purely retrospective analysis . . . . this reflects
> the fact that the necessity involved in Article 11.2 is
> not to be construed in some absolute and abstract
> sense, but as that appropriate to circumstances of
> practical reasoning intrinsic to a review process.
> Mathematical certainty is not required, but the
> conclusions should be demonstrable on the basis of the
> evidence adduced.

Korean DRAMs WTO Report, 1999 WL 38403, at *140-41.  In short, an

analysis of whether dumping is "likely" or "not likely" to occur

in the future is inherently predictive.  As a result,

operationally, Article 11.2 provides that an administering

authority has considerable discretion to make an inherently

predictive analysis.

The Court concedes that "it is a priori possible that

situations could arise where the not 'not likely' criterion is

satisfied but where the likelihood criterion is not satisfied."
Korean DRAMs WTO Report, 1999 WL 38403, at *142.  And, therefore,
there is not perfect overlap between the two standards.  Yet, the
discretion afforded to predict the state of future dumping erases
any clear conflict between the two approaches.  Indeed, the Court
is satisfied that, as applied, the discretionary authority to
make such a predictive analysis must result in general overlap
between the two approaches.  So viewed, unless the conflict
between an international obligation and Commerce's interpretation
of a statute is abundantly clear, a court should take special
care before it upsets Commerce's regulatory authority under the
Charming Betsy doctrine.  In sum, Commerce's "not likely"
requirement is consistent with U.S. international obligations
and, more specifically, its obligation under Article 11.2 of the
Antidumping Agreement.


**B.   Gap Period**

     Plaintiffs next argue that Commerce based its "not likely"
decision on data culled from an inappropriate time period.
Specifically, plaintiffs contend that, in making its "not likely"
determination, Commerce's review of data from the period after

the last day of the review period until the publication date of
the Final Results, i.e., April 30, 1996 until July, 1997, was not
in accordance with law.  Plaintiffs maintain that Commerce's
action in this respect resurrects the so-called "gap-period"
review, a procedure expressly eliminated by Commerce when it
issued revised regulations in 1989.

Before 1989, an AD order might have been revoked after only
two consecutive years of zero or de minimis dumping margins.  See
19 C.F.R. § 353.54(b) (1988).  But, before a final decision on
revocation could be issued, the regulations also required an
additional administrative review of sales made during the "gap
period" - the day after the second review period until the date
the preliminary results for the revocation decision were
published.  Id.  Because an indeterminate publication date,
rather than a regulatory deadline, governed the length of the
"gap period," a review of sales made during the "gap period"
might cover a period ranging from nine months up to several
years.[8]  Also, a "gap-period" review proceeded much like a

_____

[8] See generally L. Shambon, Revocation Under the Antidumping
and Countervailing Duty Law?: You Should Live So Long!, The
Practicing Law Institute, Vol. 2, 241, 293 & n.52 (1987) (noting
that while the "gap period" lasted at least nine months,
Commerce's "gap-period" reviews covered on average fifteen

traditional administrative review in that questionnaires were issued, responses were submitted, and even verifications were conducted.  If, after the review, Commerce found no dumping in the "gap period" and all other criteria were satisfied, the agency then could exercise its discretion to revoke the order.

In 1989, Commerce revised its revocation regulation and specifically acted to excise the "gap-period" review.  Rather than forcing a respondent to demonstrate no dumping for an indeterminate "gap period," Commerce increased the number of consecutive years of zero or de minimis dumping from two to three.  See 19 C.F.R. § 353.25(a)(2)(i) (1989).  In doing so, Commerce explained that

> the adoption of a three-year period for revocation or termination based on the absence of dumping does not substantially modify the period of time that must be examined under the current regulations. . . . The adoption in §353.25(c)(3) of the day after the end of the three-year period as the effective revocation date eliminates the need for an examination of the gap period.

Notice of Final Rule: Antidumping Duties, 54 Fed. Reg. 12,742, 12,757-58 (Mar. 28, 1989) (emphasis added).

---

months).

Plaintiffs generally argue that in its review of May to December, 1996 data, Commerce did more than simply assess whether the future occurrence of dumping was "not likely."  Instead, plaintiffs claim Commerce effectively required the companies to demonstrate the absence of dumping after the third period of review and, in so doing, resurrected the "gap-period" review.  Also, plaintiffs contend the phrase "not likely that [respondents] will in the future" make LTFV sales, 19 C.F.R. § 353.25(a)(2)(ii), only allows for review of those events that might occur after a revocation notice is published, not those events that occur immediately after the close of the third review period.  Plaintiffs thus maintain Commerce erred when it considered the May to December, 1996 data because "in the future" mandates a prospective analysis of events that might occur after the date of publication, which in this case was July, 1997.

Plaintiffs' arguments are unpersuasive.  Under the current regulation, it is true that respondents need to establish only three years of no dumping to satisfy the first criteria.  By eliminating the "gap-period" review, Commerce effected this change.  Yet, it does not follow that because Commerce reviewed the May to December, 1996 data in making its "not likely"

determination, Commerce required plaintiffs to prove an absence of dumping.  Commerce did not issue questionnaires, require responses, conduct a verification, or calculate a dumping margin for sales made during the May to December period.  Thus, Commerce simply did not conduct an administrative review or a quasi-review of May to December, 1996 sales and, hence, did not resurrect the "gap-period" review.

In addition, while Commerce may not conduct a typical full review of post-POR sales as part of its "not likely" analysis, nothing in section 353.25(a)(2)(ii) proscribes its analysis to a review of projected trends in the period afer publication of the revocation notice.  Commerce may use post-POR data, as well as analysis of post-revocation models, to assess whether future dumping is "not likely."  Commerce has discretion to decide which data it will use to assess whether future dumping is "not likely."  In sum, Commerce's decision to review post-POR and pre-revocation notice data was in accordance with law.

C.    __Substantial Evidence Supports Commerce's Decision.__

Plaintiffs point to a host of evidentiary flaws in Commerce's decision and claim that, on the whole, the decision is not supported by substantial evidence.  More specifically, plaintiffs identify eight alleged defects in support of their claim: (1) both plaintiffs contend Commerce's reliance on below-cost sales for the May and June, 1996 period to support its "not likely" decision is unsupported by the record evidence; (2) both plaintiffs contend Commerce's reliance on spot-pricing data as evidence of future dumping is misplaced and runs counter to company-specific pricing and cost data; (3) Hyundai contends Commerce ignored crucial evidence showing that the DRAM industry improved in 1997; (4) Hyundai contends the record does not show that production levels and inventory levels were increasing; (5) Hyundai contends Commerce ignored evidence that it had no incentive to dump in the U.S. market because it was building a DRAM facility in the United States; (6) LG Semicon contends it had no incentive to dump in the future because its U.S. market share is so small; (7) LG Semicon contends Commerce failed to consider crucial exchange rate data that indicates LG Semicon was "not likely" to dump in the future; and, finally, (8) both

plaintiffs contend Commerce ignored the fact that the companies were willing to participate in a data collection program to dispel the notion that future dumping might occur.  The Court considers each argument posed by plaintiffs in turn below and holds that, while other conclusions might easily be drawn from the record, Commerce's determination is nevertheless supported by substantial evidence.

> **i.  Commerce's Reliance on May and June 1996 Data Indicating Sales Below Cost is Supported By Substantial Evidence.**

In the Final Results, Commerce examined cost data submitted by the parties as part of the third administrative review. Included in this data was information for the two shoulder months immediately following the close of the third review period, i.e., May and June, 1996.  Commerce decided to use this data for its revocation analysis.  In doing so, Commerce found that both respondents made "a substantial number of home market sales [] at prices below [cost of production] during [the] two months immediately following the close of the third administrative review."  Final Results, at 39,817.  Commerce stated that the existence of below-cost home market sales in May and June, 1996 "is suggestive of deteriorating market conditions that often give rise to dumping."  Id.

Plaintiffs point out that the statute only allows Commerce to disregard below-cost sales when calculating the dumping margin if they (1) have been made within an extended period of time in substantial quantities, and (2) were not at prices which permit recovery of all costs within a reasonable period of time.  See 19 U.S.C. § 1677b(b)(1).  And, the statute defines an extended period of time as "a period that is normally 1 year, but not less than 6 months."  19 U.S.C. § 1677b(b)(2)(B).  Because the sales at issue plainly were not made over an extended period of time, plaintiffs maintain that the May and June, 1996 data cannot be used to support Commerce's revocation decision.

The Court agrees in part.  Plaintiffs are correct in noting that for purposes of calculating a dumping margin, more than two months of below-cost sales are needed before such sales may be disregarded.  Commerce even concedes as much in the Final Results:

> We note that, according to the Department's cost test methodology, these below cost sales were not sufficiently numerous for the Department to reject as a basis for determining normal value in the third review.  We also agree with LGS that whether it made home market sales at prices below COP during the two months immediately following the close of the third review period in and of itself does not demonstrate that dumping occurred.

Final Results, at 39,817.  Thus, standing alone, below-cost sales
made over a limited time period cannot amount to substantial
evidence that a respondent will engage in future dumping.  See,
e.g., Steel Wire Rope from Korea, 62 Fed. Reg. 17,171, 17,174
(Apr. 9, 1997) (finding that evidence of below-cost sales alone
did not support petitioner's claim that LTFV sales were likely to
be made in the future).  Yet, as discussed earlier, Commerce has
discretion to decide which data it will use to make its "not
likely" determination.  While the Court agrees that below-cost
sales over a limited period alone are not indicative of future
dumping, Commerce may, in its discretion, use such data as one
factor among several to guide its "not likely" decision.
Consequently, the Court finds that the May and June, 1996 below-
cost sales, in conjunction with other factors, constitutes
substantial evidence to support a "not likely" determination.

**ii.  Commerce's Finding that the Submitted Pricing and Cost Data is Indicative of Future Dumping is Supported by Substantial Evidence.**

Plaintiffs next contend that Commerce misconstrued and
ignored the submitted pricing and cost data to such an extent
that the "not likely" determination is not based on substantial
evidence.  Both plaintiffs critique Commerce's analysis of spot

and actual prices and contend the data show that future dumping is not likely.  In addition, plaintiffs generally claim that Commerce improperly rejected some cost data, then inexplicably accepted other cost figures such that its price-to-cost comparisons were fundamentally skewed.

More specifically, plaintiffs claim Commerce's reliance on spot-pricing data is misplaced because these prices did not reflect contract prices to large U.S. original equipment manufacturers ("OEMs"), which represented a significant portion of respondents' U.S. sales.  According to Hyundai, Commerce also failed to give adequate weight to its submitted cost data.  In particular, Hyundai points to an economist's report it presented to Commerce during the review, illustrating that in all scenarios 16M DRAM prices would exceed Hyundai's costs by substantial margins in 1997 and 1998.  See Hyundai's Letter to DOC Transmitting Case Brief (Apr. 21, 1997), Ex. 2, P.R. Doc. No. 121 ("Hyundai's DOC Br.") (attaching an April 1997 report of Dr. Kenneth Flamm entitled "Economic Analysis of 16 Megabit DRAM Cost and Pricing: Projections for 1997 and 1998").  Hyundai argues that the econometric forecasts noted in Dr. Flamm's report were based on conservative assumptions, and Commerce gave insufficient

credence to the report.  Hyundai also notes that Commerce's
price-to-cost comparison was flawed in part because it compared
the average price for all types of one DRAM model with the cost
of only one type within that model.  Hyundai maintains these
combined defects in Commerce's analysis render its decision
unsupported by substantial evidence.

Similarly, LG Semicon notes that, as part of the third
review, Commerce verified that LG Semicon's actual prices during
May and June, 1996 were higher than U.S. spot prices for the same
period.  Furthermore, LG Semicon argues the record shows that its
actual prices - typically based on contract prices that lagged
far behind the declining spot market - remained above its own
declining costs of production throughout the downturn.  See LG
Semicon's Br. at 29.  And, contrary to Commerce's finding, LG
Semicon insists that its submitted data, showing declining costs
in the second half of 1996, were reliable.  Finally, LG Semicon
points out that even though DRAM prices were declining rapidly
from January to April, 1996, Commerce found plaintiffs did not
engage in dumping during this period.

Plaintiffs claims have merit.  Indeed, it is fair to say
that one could reasonably find respondents were not likely to

dump in the future based on the record evidence.  Yet, it is not for the Court to reweigh the evidence; rather, the Court must simply review the record to ascertain if Commerce's determination is supported by substantial evidence.  See Matsushita Elec. Indus. v. United States, 3 Fed. Cir. (T) 44, 54, 750 F.2d 927, 936 (1984) (noting that it is not the function of the court to reweigh evidence).

Commerce dedicated a significant portion of the Final Results to analysis of the pricing and cost data and its effect on the "not likely" determination.  Commerce summarized its analysis in the following passage:

> (1) The respondents' own sales and cost data indicate that there were a substantial number of home market sales made at prices below COP during the two months immediately following the close of the third administrative review; (2) the lowest point of the downturn, in terms of DRAM pricing and other market conditions, did not occur until after mid-1996 (well after the end of the third administrative review period); (3) publicly available spot market pricing data, when viewed in conjunction with the respondent's [sic] cost data, extrapolated to a future point in time, indicate that LGS and Hyundai may have made U.S. sales at prices below COP during 1996; (4) respondent's [sic] own pricing data indicate that contract prices generally follow the same pricing patterns as spot market prices; and (5) many of the respondents' arguments concerning the alleged distortions and inaccuracies in the petitioner's analysis lack merit. In addition, we find that the respondents made several changes to their costs immediately following the third

> review period, including changes in depreciation and
> foreign exchange loss write-offs.

Final Results, at 39,817.  In addition, Commerce noted that

industry revenues worldwide plunged during the 1996 downturn and,

in particular, respondents both reported "dramatic decreases" in

their 1996 financial statements.  Id. at 39,816.

Turning to the record, the evidence shows that while there

typically is a lag, contract prices to OEMs did in fact trend in

the direction of spot-market prices.  See Mem. from Program

Manager/IA to Principal Deputy Asst. Sec'y/IA (July 16, 1997),

Charts C-E, C.R. Doc. No. 42 ("Final Analysis Mem.") (showing

comparison of respondents' actual U.S. prices and spot prices).

As Commerce found, the record also contains press reports

indicating that contract prices were below spot prices in 1997.

See Hyundai DOC Br., Ex. 9 (Computer Reseller News, About-Face:

DRAM Reverses Course - Memory Prices on the Rise, Mar. 17, 1997,

noting that "spot market prices are higher than OEM pricing by as

much as $4"), and Ex. 11 (Electronic Buyer's News, Koreans Reduce

DRAM Flow, Apr. 14, 1997, noting that spot market prices were

about fifty cents higher than contract prices).  The confidential

record also illustrates this point, at least with respect to one

respondent.  And, review of the confidential record pertaining to

Dr. Flamm's study shows that report even supports some of
Commerce's price-to-cost conclusions for the 1997 period.

Similarly, the record affirms that Commerce had reason to
express skepticism about LG Semicon's submitted cost data.
Specifically, LG Semicon did not report its change in the
depreciation schedule and its corresponding effect on cost until
after the verification and after Commerce issued its preliminary
results.  Because LG Semicon decided not to disclose this
significant change until late in the proceedings, Commerce had
reason to question the effect of the change on LG Semicon's cost
data.  It was therefore reasonable for Commerce to accord little
weight to LG Semicon's unverified cost data and the corresponding
cost projections and for it to rely instead on Micron's submitted
projections.  Finally, LG Semicon is correct that Commerce found
de minimis margins for LG Semicon for the January to April, 1996
period, even though DRAM prices were declining rapidly during
this period.  Yet, the record also shows that DRAM prices
continued to decline between May and December, 1996, and in some
cases by as much as sixty percent.

Thus, while the Court again notes that in its view, Commerce
could have decided that the voluminous record showed respondents

were not likely to dump in the future, this is neither surprising nor persuasive.  "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966); see also Matsushita, 3 Fed. Cir. (T) at 54, 750 F.2d at 936 (noting that it is "neither surprising nor persuasive" that a plaintiff can point to record evidence that detracts from Commerce's determination).  Upon careful review of the record evidence here, the Court is satisfied that Commerce's assessment of the pricing and cost data and its impact on the "not likely" decision is supported by substantial evidence.

### iii. Commerce's Characterization of the DRAM Market's Health is Supported by Substantial Evidence.

Hyundai argues that Commerce's decision is unsupported by substantial evidence because it focused on the condition of the DRAM market in 1996, rather than 1997.  Hyundai maintains that evidence on the record illustrated that the DRAM market had stabilized in 1997 and, hence, the record demonstrates that respondents were not likely to dump in the future.  In particular, Hyundai points to record evidence indicating that spot prices for two high volume DRAM models increased between

October, 1996 and April, 1997.  See Hyundai DOC Br., Ex. 4.

Hyundai also references two reports from industry analysts in

1997 -- one stating "[w]e believe that the momentum of the

current drive to raise prices will carry on at least through May,

[1997]" id. at Ex. 5 (De Dios & Associates, The DRAM Market

Advisor, Feb. 5, 1997, at 11), and the other noting that "[t]he

long awaited DRAM cycle has turned up. . .  Memory bit growth is

believed to be strong, faster than supply at the margin and less

excess capacity exists than many have estimated."  Id. at Ex. 15

(Merrill Lynch, Semiconductors Update, Mar. 5, 1997).  Finally,

Hyundai notes the record establishes that Micron itself even

acknowledged the improved market conditions in 1997.

It is true that in the Final Results, Commerce devoted

significant attention to the declining state of the DRAM industry

in 1996.  See Final Results, at 39,816-17 (noting repeatedly the

various indicators illustrating a market downturn in 1996).  In

addition, however, Commerce considered the health of the industry

in 1997.  Indeed, consistent with Hyundai's claim, Commerce

remarked that "market conditions in the DRAM industry have

recovered somewhat in 1997."  Id. at 39,814.  Yet, Commerce later

was careful to temper this statement and make clear that, in its

view, the stability of the market was still uncertain in 1997.

More specifically, Commerce found that

> Wholly apart from the data concerning the 1996
> downturn, . . . our analysis indicates that market
> conditions in the DRAM industry remain volatile.  As
> stated previously, while the plunge in prices began to
> stabilize somewhat in early 1997, recent data indicate
> that prices are headed downward again.  For example,
> according to publicly available data, the average U.S.
> price for a 16M DRAM fell from approximately $18.00 in
> May 1996 to approximately $7.00 in December 1996.
> According to Dataquest, the price for the 16M as of
> June 30, 1997, is approximately $6.50.  This represents
> a 64 percent decline in prices between the end of the
> third period of review (April 30, 1996) and June 1997.

Final Results, at 39,818.  The record supports Commerce's

analysis.  For instance, just prior to Commerce's decision, spot

prices for one DRAM model dropped nearly fifteen percent in two

weeks.  See Letter from Micron to DOC (July 3, 1997), Attach.,

P.R. Doc. No. 153 (Dataquest, The Semiconductor DQ Monday Report,

June 23, 1997, and June 30, 1997).  Also, the record indicates

that some industry analysts expressed skepticism about the

market's rebound.  In particular, one of the reports cited by

Hyundai commented that "[t]he momentum and market psychology can

still shift back in the opposite direction," Hyundai DOC Br.,

Ex. 5 (De Dios & Associates, The DRAM Market Advisor, Feb. 5,

1997, at 2), while another report indicated that "[t]he mainstay

16-Mbit market last week continued to be highly unstable.
Analysts and independent distributors all agreed that average
selling prices slipped about 10% in the spot market."  Letter
from Micron to Commerce (May 2, 1997), Ex. 1, P.R. Doc. No. 133
(Electronic Buyer's News, <u>DRAM Price Skid Reaches 64-M Parts</u>,
Apr. 28, 1997).  In sum, the Court is satisfied that Commerce
reached its "not likely" determination after considering the
state of the DRAM industry in both 1996 and 1997.  And, the Court
is satisfied that substantial evidence supports Commerce's
analysis in this respect.

### iv. Commerce's Assessment of Supply and Demand Trends in 1997 is Supported by Substantial Evidence.

During the underlying administrative proceeding, respondents
publicly announced that they planned to reduce production on
lower priced DRAMs.  Hyundai contends the production cutbacks
were intended to bring supply and demand into balance, thereby
stimulating recovery in the DRAM market.  As support, Hyundai
points to an article on the record, reporting that Korean
producers actually were reducing production in early 1997.  "The
longer the flow of South Korean DRAMs into the spot market
remains low, the more credible are claims of the Big Three chip
makers in that country that they aren't building up excessive

stocks that must be dumped later."  Hyundai's DOC Br., Ex. 11 (Electronic Buyer's News, Koreans Reduce DRAM Flow, Apr. 14, 1997).  Hyundai also identifies record evidence forecasting continued growth in personal computers for 1997 and claims corresponding demand for DRAMs was likely to result.  Hyundai maintains Commerce gave insufficient weight to this record evidence, which, according to Hyundai, tends to show that respondents would not be likely to dump in the future.

In the Final Results, Commerce acknowledged that respondents announced cutbacks in DRAM production yet concluded "it is unclear how much of an effect this will have on the overall supply of DRAMs."  Final Results, at 39,817.  Commerce's conclusion is supported by substantial evidence.  First, some reports on the record indicated that the announced production cuts were actually production shifts from the 16M DRAM to the 64M DRAM, see Hyundai DOC Br., Ex. 7 (Electronic News, Korean Big 3 in Partial Shift to 64M, Feb. 3, 1997), and that "excess supply" of 64M DRAMs was expected to persist throughout 1997.  See Letter from Micron to DOC (May 2, 1997), Ex. 1, P.R. Doc. No. 133 (Electronic Buyer's News, DRAM Price Skid Reaches 64-M Parts, Apr. 28, 1997).  In addition, one industry report issued in

April, 1997 concluded that "Korean DRAM makers have not reduced their production of DRAMs in the last 6 weeks.  However they have started holding product off the market and are constraining supply to prop [up] prices, while building inventories in die banks that will be unleashed on the market later."  Letter from Micron to DOC Transmitting Resp. Br. (Apr. 30, 1997), Ex. 1, P.R. Doc. No. 132 (Goldman, Sachs & Co. Investment Report, Apr. 14, 1997).  Upon review of the record evidence, the Court finds that Commerce's analysis of the effect of respondents' announced production cuts on overall supply and demand is based on substantial evidence.

> **v.   Commerce's Decision is Based on Substantial Evidence, Notwithstanding Hyundai's Construction of a DRAM Facility in the United States.**

Hyundai next argues that it has no economic incentive to dump in the future.  More concretely, Hyundai informed Commerce that the company was "in the final stages of building" a $1.4 billion DRAM wafer fabrication facility in Eugene, Oregon.  See Hyundai DOC Br., at 26-27.  Hyundai noted that when operational, the Eugene facility will be one of the largest DRAM plants in the United States and will be capable of producing the most advanced DRAM models.  Id.  Commerce made no mention of this evidence in

its <u>Final Results</u>; because Hyundai maintains this evidence
plainly indicates it has no incentive to dump in the future, it
argues Commerce's "not likely" decision is not based on
substantial evidence.

The Court does not agree.  Hyundai is correct in that
Commerce's <u>Final Results</u> did not probe the effect of Hyundai's
new facility on future dumping.  And, the Court is puzzled by
government counsel's following defense at oral argument: "What
[the building of the plant] tells you at a minimum is that
[Hyundai] may not need to ship to the United States.  It doesn't
tell you a [] thing about dumping, price discrimination."  Tr. of
Oral Arg., at 57.  It is unclear to the Court how future dumping
is possible if there are no shipments to the United States.
Notwithstanding the infirmity in counsel's presentation at oral
argument, Commerce correctly points out that there is no evidence
on the record to indicate that Hyundai will stop, or even
decrease, shipments to the United States after the facility comes
on line.  While one surely might reach this conclusion by virtue
of the plant's existence, one also might not.  And, no record
evidence exists to resolve the question.  So viewed, it was
reasonable for Commerce to ignore the existence of the Eugene

facility, and its decision to do so does not detract from the whole of the record evidence that supports the "not likely" determination.

####     vi.  Commerce's Finding that LG Semicon In Fact Had Economic Incentive To Dump, Notwithstanding Its Small Market Share, is Supported by Substantial Evidence.

LG Semicon contends that Commerce's "not likely" decision is unsupported by substantial evidence because the company is not a major participant in the U.S. market and, thus, has no economic incentive to dump.  In particular, LG Semicon highlights record evidence, illustrating that the U.S. market made up only a small percentage of its total global DRAM sales in 1995 and 1996.  And, LG Semicon notes that it ranked 12th among 17 U.S. DRAM suppliers in 1996 by volume, holding only two to three percent of the market throughout the period of review.  On this evidence, LG Semicon asserts it had no rational business incentive to dump in the future.

In the Final Results, Commerce responded to LG Semicon's argument as follows:

> the United States is part of the world's largest regional market for DRAMs, with considerable growth potential. Given the importance of the U.S. market, as a general matter, even a producer with a relatively small market share would have an incentive to ride out industry downturns.  The fact that DRAM producers,

> including Korean respondents, have historically been
> found to have dumped during downturns supports this
> conclusion.

<u>Final Results</u>, at 39,819.  Record evidence shows that the United

States is the world's largest market for DRAMs.  <u>See</u> Final

Analysis Mem., Point 4.  Moreover, record evidence shows that in

absolute terms, the value of LG Semicon's DRAM sales in the U.S.

market was significant through the POR.  <u>Id.</u>  Based on this

evidence alone, it was entirely reasonable for Commerce to

conclude that the U.S. market would remain significant for LG

Semicon despite its small market share.

### vii. Commerce Considered Exchange Rate Data and Its Conclusions are Based on Substantial Evidence.

LG Semicon next argues that Commerce failed to consider

significant exchange rate data.  The record demonstrates that the

Korean won appreciated against the U.S. dollar over the course of

the POR, thereby raising the cost of producing DRAMs in Korea.

LG Semicon concedes this point yet notes that the record also

shows the won depreciated against the dollar after the POR,

thereby decreasing Korean production costs and the potential

incidence of sales below cost.  LG Semicon also offered data,

showing that Korean producers purchased much of their equipment

from Japan, which it considers significant because the yen

depreciated against the won after the POR.  Thus, LG Semicon

asserts that its purchases of Japanese equipment after the POR

were less expensive, thereby further reducing production costs.

LG Semicon maintains that Commerce failed to consider these

currency movements and their effect on Korean DRAM prices and

costs.

     Commerce considered the exchange rate data.  First, Commerce

acknowledged this claim in the Final Results, noting that LG

argued "the won is currently depreciating against the dollar,

negating the possibility of exchange rate dumping."  Final

Results, at 39,816.  Commerce then responded to this argument

when it stated,

> we note that Korean DRAM producers import machinery and
> equipment and many raw materials.  In fact, both
> respondents recorded large foreign exchange losses for
> fiscal year 1996.  Therefore, the depreciation of the
> won may have actually tended to increase the
> respondent's COP, making dumping more likely in the
> United States.  At the very least, we find no basis in
> the record to conclude that this exchange rate
> depreciation entirely favored the respondents.

Id., at 39,818.  It is true that at first blush the depreciating

won should lead one to conclude that production costs would

decrease, thus making sales below cost less likely.  Yet, upon

careful review of the record, the Court is satisfied that Commerce's conclusion was reasonably drawn.  Two factors particular to this case support this finding.  Specifically, the effect of the won's depreciation on (1) servicing foreign-currency denominated loans, and (2) depreciation costs for machinery and equipment, an important cost factor, made it conceivable that LG Semicon's costs might have increased as a result of the won's depreciation.  Thus, Commerce considered LG Semicon's argument and its conclusion is reasonable based on the record evidence.

    **viii. Commerce Correctly Decided that the Proposed Data Collection Program Was Not Relevant to the "Not Likely" Determination.**

Finally, both plaintiffs argue that Commerce ignored a crucial piece of evidence that had direct bearing on whether respondents were "not likely" to dump in the future -- a proposed data collection program between a U.S. importer of Korean DRAMs, Compaq Computer Corporation, and the government of Korea that had been accepted by both LG Semicon and Hyundai.  The parties intended the proposal as additional assurance that Korean producers would not dump in the future.  Plaintiffs maintain

Commerce disregarded the import of this program and, hence, its decision is not based on substantial evidence.

This argument is without merit.  For purposes of the "not likely" assessment, the Court fails to see how the proposal at issue is to be distinguished from the requisite agreements that respondents must enter pursuant to 19 C.F.R. § 353.25(a)(2)(iii). That is, both forms of agreement appear to provide that respondents' activity in the DRAMs market will be monitored to assure that dumping does not recur.  It is unclear then why the proposal at issue has some purported relevance for the "not likely" determination, though, as the framing of the regulation makes clear, the requisite agreements do not.  Thus, Commerce was correct when it stated that "while we have considered this proposed data program, we find that this program has no bearing on the likelihood issue."  Final Results, at 39,811.

* * *

In sum, plaintiffs have identified record evidence that detracts from Commerce's "not likely" determination.  Indeed, after combing the record, the Court finds that the agency very easily might have reached the opposite conclusion.  Yet, this is unsurprising given the extensive record in this case.  Commerce

was charged with the very difficult task of predicting future behavior.  And, while certain record evidence detracts from its decision, the Court is also satisfied that, on the whole, substantial evidence supports its decision.


## IV.
### CONCLUSION

For the foregoing reasons, the Court sustains Commerce's decision not to revoke the antidumping order on DRAMs from Korea. A separate Order will be entered accordingly.


_____
                    Richard W. Goldberg
                    JUDGE

Dated:     May 19, 1999
           New York, New York.